BETTIE CAFARO, PLAINTIFF-RESPONDENT, v. GUIDO CAFARO, AN INFANT, BY HIS GUARDIAN, CIRO CAFARO, DEFENDANT-APPELLANT.

Submitted October 30, 1936—Decided April 12, 1937.

For the appellant, *Townsend & Doyle* (*Mark Townsend* and *Thomas F. Doyle,* of counsel).

For the respondent, *Louis Santorf.*

The opinion of the court was delivered by

HEHER, J.   Parental emancipation was unknown to the common law.   Although it ordinarily relates to the services and earnings of the child and the right to sue and recover therefor (*e. g., Costello* v. *Prospect Brewing Co.,* 52 *N. J. Eq.* 557, 560; *Snediker* v. *Everingham,* 27 *N. J. L.* 143, 148), and, so confined, is termed partial emancipation (20 *R. C. L.* 608, 609), in its general sense it signifies a surrender and renunciation of the correlative rights and duties touching the care, custody and earnings of the child.   *Campbell* v. *Campbell,* 11 *N. J. Eq.* 268, 272; *Overseers of Alexandria* v. *Overseers of Bethlehem,* 16 *N. J. L.* 119; *Brown* v. *Ramsay,* 29 *Id.* 117; *Delaware, Lackawanna and Western Railroad Co.* v. *Petrowsky,* 250 *Fed. Rep.* 554; *Inhabitants of Carthage* v. *Inhabitants of Canton,* 97 *Me.* 473; 54 *Atl. Rep.* 1104; 46 *C. J.* 1342, 1343.   Borrowed from the Roman law, the term imported under that system full enfranchisement by the father.

Upon attaining majority, but not before, the child may elect to sever the relationship, and the concurrence of the parent is not essential to render it effectual.   *Overseers of Alexandria* v. *Overseers of Bethlehem, supra; Brown* v. *Ramsay, supra.*   The law raises a presumption against emancipation of a minor child; and thus there is laid upon him who asserts it the burden of establishing, by competent evidence, the requisite parental consent thereto, either express or implied.

Here, there was no evidence of voluntary parental emancipation, either general or special; nor is this fairly to be implied from the circumstances. Non-emancipation conclusively appeared.

The family comprised the parents, three daughters, two of whom were minors, and the infant defendant; and it is indisputable that at all times pertinent to this inquiry they worked for their joint interest. The parents were thrifty. They conducted a grocery business in the family habitat, while the father also worked in a mill nearby. And, for a period of fourteen years, it had been their practice to attend Italian festivals in the surrounding communities, and there merchandise food and other commodities in demand on such occasions. The mother and son were returning to their home from such a festival, held in Union City, at the time of the occurrence giving rise to this action. She managed these businesses, and was the family treasurer. The children, including the adult daughter, turned over their earnings to her. She banked and disbursed the income of the business, as well as the family earnings.

While the trial judge, in disposing of evidentiary objections interposed by respondent, unduly circumscribed appellant's counsel in his efforts to establish the relationship of the parties, these uncontroverted facts appeared: For a period of a year or more, the infant defendant was employed at a neighboring dye works; and, while so employed, he delivered his entire earnings to his mother, receiving from her two or three dollars weekly for "spending money." Two weeks before the mishap made the basis of this suit, his employment was terminated by a strike, and thereafter he served his parents in the grocery business. The same weekly "spending" allowance was made while he was so engaged. Although plaintiff testified that, for this service rendered by the infant defendant, she "would give him twelve or thirteen dollars a week," what she later said by way of amplification discloses that this was but an afterthought, purely interpretative in character, unfounded in fact, and evidently designed to lay the foundation for the claim that, in respect of the infant's services and earnings, the family tie had been severed, and he was there-

fore the master of his own affairs; and thus this piece of testimony was valueless as evidence to support a finding of emancipation. This is emphasized, and the relationship given character, by the uncontroverted proofs that, while his earnings at the mill varied between $10 and $20 dollars per week, the mother made to him the same weekly allowance of $2 or $3, "to go out and have some fun with."

Admitting that the infant's entire earnings were turned over to her, the mother testified thus: "I would give him three or four dollars for spending money, and the rest I would keep for his board and clothing. * * * Q. And did that apply to your grocery store also? A. There was hardly any profit in the store. We would pay the interest and pay the taxes and feed the children with it and everybody would eat there and that would be the money. * * * Q. Well, the fact is, you used to dress him and feed him, did you not? A. When he was working, yes; when he was small, just the same as when he did not work. * * * He would bring me the money and I would buy everything." Concededly, the parents recognized and discharged the self-same obligation to provide respondent with food and clothing, and to furnish him with spending money, while he was unemployed.

We perceive in these circumstances no rational basis for a finding of emancipation, either general or limited. Whether the minor child be employed at home or abroad, the mere allowance of "spending money" from his earnings, contributed to his parents, is not, without more, sufficient to sustain an inference of emancipation. This is the generally accepted rule. *Schoul. Dom. Rel.* (*6th ed.*), § 808. Such course of conduct is entirely consistent with the continued subjection of the minor child to parental care and control, and is therefore not a manifest of intention to effect emancipation within the intendment of the law; rather it definitely demonstrates a contrary purpose.

The integrity of the family relation, ever fostered by the law, does not rest upon a foundation so flimsy. Compare *Reingold* v. *Reingold,* 115 *N. J. L.* 532; *Dunlap* v. *Dunlap,* 84 *N. H.* 352; 150 *Atl. Rep.* 905; 71 *A. L. R.* 1055. The relation of parent and child embraces primary rights and duties which

render insupportable the inference of general emancipation from the child's mere rendition of services to others with parental permission. It is significant that here the old family relationship was resumed after the termination of the infant's outside employment. See 20 *R. C. L.* 611. In the ascertainment of the parental intention, a factual distinction is required to be made "between a license for the child to go out and work temporarily, and the more positive renunciation of parental rights." *Schoul. Dom. Rel.,* § 808. Neither the former circumstance nor the allowance of "spending money," standing alone, justifies an inference of the destruction of the filial relation. *Lufkin* v. *Harvey,* 131 *Minn.* 238; 154 *N. W. Rep.* 1097.

These principles are grounded in a sound public policy, of common law origin—much broader than the parent's right to the services and earnings of the minor child—that regards the family as a primary social unit and cherishes it in the general public interest. *Reingold* v. *Reingold, supra; Schneider* v. *Schneider,* 160 *Md.* 18; 152 *Atl. Rep.* 498; 72 *A. L. R.* 449; *Duffy* v. *Duffy,* 117 *Pa. Super. Ct.* 500; 178 *Atl. Rep.* 165; *Malarese* v. *Malarese,* 47 *R. I.* 131; 131 *Atl. Rep.* 198; 42 *A. L. R.* 1360; *Wick* v. *Wick,* 192 *Wis.* 260; 212 *N. W. Rep.* 787; 52 *A. L. R.* 1113. To borrow the language of Professor Schouler, "both natural and politic law, morality, and the precepts of revealed religion alike demand the preservation of this relation in its full strength and purity." *Schoul. Dom. Rel.,* § 694.

And so, even emancipation limited to the minor child's services and earnings would not suffice to remove the disability thus laid upon the parent in respect of tortious injury sustained at the hands of the child. There must be emancipation in the primary sense of complete severance of the filial tie. Partial emancipation is not to be given a scope beyond the parent's intention.

While our Supreme Court has said that the question of emancipation *vel non* is "ordinarily" one of fact (*Goldstein* v. *Goldstein,* 4 *N. J. Mis. R.* 411), the rule in these, as in other cases, is that where the evidence, appraised by fair and reasonable minds, is susceptible of *bona fide* differences of

opinion as to the facts, the issue is required to be committed to the triers of the facts for resolution; otherwise, it is a question of law for the court. It is pertinent to observe here that the "mere scintilla" of evidence doctrine does not obtain in this state. *Schmid* v. *Haines,* 115 *N. J. L.* 271. The plaintiff was properly nonsuited.

There is therefore no occasion to decide whether the joint action of the father and mother is, under normal circumstances, essential to emancipation within the contemplation of the law. At the common law, parental rights were vested in the father alone, as the head of the family. The mother succeeded to those rights upon their forfeiture by the father, or upon his death or incapacity. *Campbell* v. *Campbell, supra.* But the common law has been modified by statute. Chapter 201 of the laws of 1926 (*Pamph. L., p.* 333) provides that, unless "one of the parents * * * has abandoned the child, or been deprived of its custody by court decree," the father and mother (or the survivor) of a minor child are "equally entitled to its services and earnings;" and that "the parents jointly may maintain an action for loss of the wages or services of their minor child when such loss is occasioned by an injury wrongfully or negligently inflicted upon such child." See 20 *R. C. L.* 634. The father did not take the witness stand; and there is no evidence tending to show his intentional surrender of parental control.

Nor are we required, in the view thus taken of the case, to deal with the interesting question of whether sound public policy disables a parent from suing his emancipated minor child living in his household. See *Schneider* v. *Schneider, supra.*

The judgment of the Supreme Court is accordingly reversed, and the judgment of the Passaic Common Pleas affirmed.

*For affirmance*—The CHANCELLOR, TRENCHARD, PERSKIE, DEAR, WOLFSKEIL, COLE, JJ.   6.

*For reversal*—PARKER, CASE, BODINE, HEHER, HETFIELD, WELLS, RAFFERTY, JJ.   7.