247 N.J. Super. 572 (1991)
589 A.2d 1077
CAROL QUINN, FORMERLY CAROL JOHNSON, PLAINTIFF,
v.
FLOYD JOHNSON, DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part, Bergen County.
January 30, 1991.
*573 Karen Ford Edler for plaintiff.
*574 Joel M. Albert for defendant.
HARRIS, J.S.C.
Absent unfitness, when does a parent lose the right to custody of a child? Conventional wisdom informs us that custody may be lost in such a situation when it will further the best interests of the child. When does the court cease to make a best interest inquiry: at majority, upon emancipation, or at another time? The answer is difficult and close.

Background
The object of the court's attention is Brian Johnson, age 18 (date of birth October 22, 1972), a high school senior, who is now living with his 22 year old sister in a rented apartment in Ramsey that is being paid for by his father. Brian moved out of his mother's (Carol Quinn's) home on December 1, 1990 and into this apartment after giving her five days' notice.
Mrs. Quinn seeks an order compelling her former husband to revoke his permission allowing Brian to live without a parent, compelling Mr. Johnson to continue to pay her child support, and requiring Mr. Johnson to cease paying support to Brian directly.
Mr. Johnson seeks an order relieving him of the obligation to pay Mrs. Quinn child support on behalf of Brian.
This post-judgment proceeding emanates from a 1983 judgment of divorce. In an uncontested matter, the parties entered into an oral property settlement agreement that was incorporated into the ultimate judgment. In that agreement, the parties determined that residential custody of the then-unemancipated children would be with Mrs. Quinn. However, they agreed to
"... joint custody in the sense of consulting with one another about major decisions on health, education, and welfare."
Unquestionably, if the agreement still controls, to the extent that he precipitated Brian's move, Mr. Johnson breached at least the spirit of the agreement, since he made no attempt to consult with Mrs. Quinn before the modification of custody was *575 effectuated. Naturally, this begs the question of the efficacy of the agreement in light of Mr. Johnson's position that Brian's majority obviates the custody provisions of the agreement.
The parties' agreement provided for unallocated support of $45,000.00 per year, with its transformation into child support of at least $150.00 per week per child if the wife were no longer entitled to receive alimony[1]. The parties agreed that they would be responsible to pay for the college educations of their children "in accordance with their then respective financial ability." (As part of the instant proceedings, Mr. Johnson has agreed that he shall be responsible for 100% of the college education expenses of Brian.) Ironically, they also agreed, "[t]he parties in all respects have been able to work out matters relating to their children and economic matters."
The current dispute is not the parties' first brush with post-judgment applications in the Family Part. There is already a plenary hearing scheduled to address, among other things, a claim for arrears by Mrs. Quinn. The plenary hearing was also intended to address the parties' respective responsibilities to pay for Brian's college education. The concession by Mr. Johnson that he will fund 100% of Brian's college costs makes that aspect of the plenary hearing moot.
The evidence adduced on the cross motions suggests that Brian is a reasonably good kid. It is alleged that he has not been in any "serious trouble." He is employed on a part-time basis as a bank employee. He is in the process of applying to colleges and "has both the academic ability and standing in his class to attend college."
There is no material evidence that Brian has suffered because of the move on December 1, 1990. There is a factual dispute *576 regarding the purchase of beer for Brian,[2] but no one has alleged any specific jeopardy to Brian's best interests, other than Mrs. Quinn's generalized view that Brian would be better off living with her, rather than with his sister.
Brian submitted a certification that stated that his decision to move from his mother's home was "of my own free will after weighing the pros and cons of this decision and after having lengthy discussions with my sister." Notably absent from Brian's certification is any statement that he consulted with either his mother or father before making up his mind. This suggests either (1) indirect enticement by his father, (2) alienation from his mother, or (3) true psychological independence by a person who has reached majority.
Mr. Johnson concedes that Brian is not emancipated. However, he asserts that emancipation or lack of such status does not affect or control the mode of analysis on this application. Rather, he claims that the sole indicia for conceptualization is Brian's age. Based upon that analysis, Brian's decision must be accorded absolute recognition, confirmation, and validation; a "best interests" analysis is unwarranted and inappropriate.

Conclusions of Law
In controversies between parents for the custody of children, there can exist no restraint upon the mind of the court and all legitimate force must be accorded to those considerations that touch the well-being of the child. Custody is not an absolute right, but rather is a trust reposed in a parent by the state as parens patriae for the welfare of the child. Yet, the oversight of the court through its inherent and statutory parens patriae jurisdiction must end sometime. Thankfully, there are no issues here that implicate a mental or physical disability of the child that would further complicate the analysis. Thus, I must decide whether an ordinary unemancipated 18 year old may be *577 indirectly forced to return to the custody and care of one of his parents. I recognize that Brian is not a party to this action, and I am aware that Brian could choose to live with his father. Mrs. Quinn concedes that if Brian chose to reside with his father, she would honor his choice and she would not be entitled to child support. Thus, notwithstanding the grandiloquent argument of the parties regarding Brian's well-being, the case really is about dollars and cents.
Although the flood of divorces is changing the social landscape of modern American civilization, it is generally assumed that a child will live with one or both of his or her parents until emancipation. This has not always been the case. For example, most of the inhabitants of seventeenth century New England were or had been servants or apprentices and separated from their parents at early ages. The removal of a child from his or her parents when only fourteen years old or less seems a little strange, in view of the importance that the Puritans attached to family relations. Apprenticeship was the customary way of learning a trade, and since the Middle Ages it had been traditional for an apprentice to live with his master, even if his home stood next door. Not only were boys put out to learn a trade, but girls were put out to learn housekeeping. Of more recent vintage, it is well known that at age 16, Albert Einstein left his parents in Italy for schooling in Switzerland where he lived with an unrelated family in Zurich. Justice Benjamin Cardozo was orphaned at age 15 and was raised by his older sister. Thus, there is no single correct family configuration for everyone, and unemancipated persons may not necessarily be harmed by living outside the orbit of a parent's influence.
In New York, it is settled that when a child reaches the age of 18 years, such child is no longer an infant or minor and in the context of custody is free to determine his or her destiny. It is reversible error in New York in a matrimonial case to award custody where the child is at least age 18. See, Matter of Frederick W., 120 Misc.2d 335, 465 N.Y.S.2d 828 (FamCt 1983); *578 Silverman v. Silverman, 50 A.D.2d 824, 376 N.Y.S.2d 182 (1975); Markland v. Markland, 67 A.D.2d 940, 413 N.Y.S.2d 202 (1979). This bright line applies even where the child is unemancipated and a "custodial" parent is receiving child support or where the child is entitled to be otherwise supported by the parent(s).
New Jersey has not directly addressed this issue. Indirectly, the Supreme Court may be cited for the proposition that "[i]n general, emancipation is the act by which a parent relinquishes the right to custody and is relieved of the duty to support a child." Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982) (emphasis supplied). See, Cafaro v. Cafaro, 118 N.J.L. 123, 124, 191 A. 472 (E. & A. 1936); Limpert v. Limpert, 119 N.J. Super. 438, 440, 292 A.2d 38 (App.Div. 1972).
In appropriate circumstances, the privilege of parenthood carries with it the duty to assure a necessary education for children, even after they reach majority. "A necessary education" is a fluid concept that can vary in different circumstances. Khalaf v. Khalaf, 58 N.J. 63, 71-71, 275 A.2d 132 (1971); Johnson v. Bradbury, 233 N.J. Super. 129, 135, 558 A.2d 61 (App.Div. 1989); Limpert v. Limpert, supra, 119 N.J. Super. at 442-442, 292 A.2d 38; Nebel v. Nebel, 99 N.J. Super. 256, 261-263, 239 A.2d 266 (Ch.Div.), aff'd o.b., 103 N.J. Super. 216, 247 A.2d 27 (App.Div. 1968); Sakovits v. Sakovits, 178 N.J. Super. 623, 630, 429 A.2d 1091 (Ch.Div. 1981).
The question of custody after a child reaches majority has not been squarely addressed by either the courts or Legislature of New Jersey. It is argued that courts have no business getting involved with the custody of an 18 year old, based upon the idea that child is no longer a minor. N.J.S.A. 2A:34-23 provides, however:
"Pending any matrimonial action brought in this State or elsewhere, or after judgment of divorce or maintenance, whether obtained in this State or elsewhere, the court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the parties and the nature *579 of the case shall render fit, reasonable and just, and require reasonable security for the due observance of such orders." (emphasis supplied)
There is no reference in the statute to the concept of a "minor," or anything else that would automatically divest the court of its parens patriae jurisdiction.
Moreover, N.J.S.A. 9:17B-3, which is generally cited for its definition of a "minor," expressly provides as an exception to the concept of majority, "the right of the court to take any action it deems appropriate and in the interest of a person under 21 years of age." Cf. N.J. State P.B.A. v. Morristown, 65 N.J. 160, 168, 320 A.2d 465 (1974). This exceptional language, coupled with the broad authority in N.J.S.A. 2A:34-23, suggests that the court may continue to order custodial arrangements for children over the age of 18 of divorced or divorcing parents. The logic of retaining that power is powerful when considered in the light of the emotional disabilities (some permanent, some temporary) observed in the offspring of divorced parents. See for example, Second Chances: Men, Women, and Children A Decade After Divorce, Wallerstein and Blakeslee (1989).
On the other hand, N.J.S.A. 9:2-3 and -4, which complement the Divorce Act and provide legislative parameters for deciding custody disputes between separated parents, refers to "minor child" as the object of the court's attention. Also, the recent amendment to N.J.S.A. 2C:13-4 (interference with custody or visitation) refers to "a minor child." In light of the exception in the Age of Majority Act, these statutory references must be tempered by the overriding requirement (subject to constitutional constraints) to act in the best interests of the child. Fantony v. Fantony, 21 N.J. 525, 535, 122 A.2d 593 (1956); Matter of Baby M, 109 N.J. 396, 453, 537 A.2d 1227 (1988).
It is perhaps too facile to hold that all unemancipated persons under the age of 21 who are the offspring of divorce remain under the parens patriae jurisdiction of the court. On the other hand, there is an elegant simplicity to hold that the court automatically loses its parens patriae jurisdiction when a person *580 reaches 18. I acknowledge the awkwardness, for example, of awarding and enforcing custody of unemancipated persons of, say, age 20. Similarly, the prospect of ordering a visitation schedule for such circumstances may seem outlandish.
Nevertheless, unless the court exercises its power and right to protect these children, it is unlikely that anyone will. The bright line of 18 too easily blinds us to the real responsibility in matrimonial actions to remain above the fray and try to preserve the best interests of the child and sometimes heal the family.
From every point of view, this case has given me an unusual degree of anxiety and concern in its decision. It has its source in, and is the present product of, marital difficulties and discords between the parties. These dissensions, through want of mutual forbearance and the exercise of a spirit of forgiveness, are prolonged to a degree that promises permanent desolation to family that was once a happy one; and that bids fair to entail a heritage of frustration, ambiguity of loyalty, and unhappiness upon the children, whose happiness and welfare both parents claim to be striving.
I conclude, not without substantial pause, that the mere attainment of the age of 18 does not deprive this court, acting as it does under the authority of N.J.S.A. 2A:34-23, of making a custody determination. The paucity of precedent in New Jersey suggests that this issue rarely arises. Nevertheless, the court cannot abdicate its inherent and statutory authority to observe the cardinal rule of action governing dissolution actions, holding the child's welfare superior to the claims of either parent. I will not jettison a best interests analysis based merely upon the passage of 18 years.[3]
*581 Accordingly, I reject the proposition advanced by Mr. Johnson that the court is utterly without power to even make an inquiry concerning the best interests of Brian. A plenary hearing shall be conducted to ascertain the circumstances of Brian's leaving his mother's home, the reasons why Brian has not chosen to live with his father, the conditions under which Brian is living, and the respective rights and liabilities of the parties for Brian's support (including child support payments to Mrs. Quinn). Naturally, the wishes and preferences of Brian will be a very important issue. The outcome of the plenary hearing may result in an order ratifying Brian's current residence. His best interests shall control the inquiry and decision.
Since there is already a plenary hearing scheduled for other, unrelated issues, the question of Brian's best interests (i.e., custody and ancillary economic issues) shall be consolidated with the existing plenary hearing and heard as one proceeding. Discovery on these new issues shall commence immediately, and shall expire no later than February 28, 1991. In the interim, Mr. Johnson shall continue to pay child support to Mrs. Quinn without prejudice to the outcome at the plenary hearing. Mr. Johnson shall be temporarily enjoined from providing any direct support to Brian. Additionally, as long as Brian's sister is an occupant of the Ramsey apartment, I cannot order Mr. Johnson to cease paying the rent. Finally, Mr. Johnson shall revoke the permission to his son that allowed Brian to move in the first place.
NOTES
[1] The agreement provided for an increase or decrease in the unallocated support and child support upon the occurrence of certain economic events.
[2] See N.J.S.A. 9:17B-1(b) and N.J.S.A. 33:1-77 for confirmation that persons under the age of 21 are not permitted to purchase intoxicating liquors.
[3] I concede that upon Brian's 21st birthday, barring any substantial disabilities, he, like the rest of adult humanity, may choose his means of "[s]truggling in vain with ruthless destiny."