13 A.3d 399 (2011)
418 N.J. Super. 262
N.H., Plaintiff-Respondent,
v.
H.H., Defendant-Appellant.
No. A-4124-09T2
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2010.
Decided February 2, 2011.
*401 Ellen C. Marshall argued the cause for appellant (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; Ms. Marshall, of counsel and on the brief; Dennis F. Feeney, Roseland, and Steven B. Gladis, Woodbridge, on the brief).
Peter C. Paras argued the cause for respondent (Mr. Paras, of counsel and on the brief; Susan M. Markenstein, Lakewood, on the brief).
Before Judges AXELRAD, R.B. COLEMAN, and J.N. HARRIS.
The opinion of the court was delivered by
JONATHAN N. HARRIS, J.A.D.
In this appeal we address a variant of the complementary dispute resolution machinery authorized in Fawzy v. Fawzy, 199 *402 N.J. 456, 973 A.2d 347 (2009) and refined in Johnson v. Johnson, 204 N.J. 529, 9 A.3d 1003 (2010). Defendant H.H. seeks to set aside the parties' Marital Settlement Agreement (the MSA) on grounds that (1) it improperly delegated the final decision regarding child custody and parenting time to a neutral expert, (2) it inequitably distributed the marital estate through overreaching conduct and inadequate disclosure, and (3) it was tainted by improper conduct of a mediator who "diluted [Mrs. H.'s] understanding of the finality of the mediation process." Specifically, Mrs. H. appeals from (1) the dual final judgment of divorce (JOD) entered on March 5, 2010, which incorporated the challenged MSA and made it a component part of the JOD, and (2) a separate order entered on the same date, which granted plaintiff N.H.'s motion for reconsideration.[1] Because we are unpersuaded that the Family Part either abused its discretion or misapplied the law, we affirm.

I.
The parties were married in 1991. They have seven children born between 1992 and 1999. Mr. H. is a New Jersey attorney, engaged in the practice of personal injury litigation, and with a criminal law practice devoted to the defense of individuals. During the marriage, Mrs. H. established an interior design business to manage projects related to Mr. H.'s office properties, as well as the couple's homes.

A.
The parties' marriage was not entirely blissful. By June 2007, the parties recognized that they had serious marital difficulties, which appeared not capable of amicable resolution. This was evidenced by correspondence between Mrs. H.'s present attorney, Ellen C. Marshall, Esq., and Mr. H.'s attorney at the time, Frank A. Louis, Esq., which revealed several problems and disputes that were simmering amidst the family.
On August 22, 2007, Mrs. H. was hospitalized at the Sierra Tucson treatment facility in Tucson, Arizona for, among other things, treatment of suspected addictions and mental and behavioral disorders. After completing a twenty-eight day inpatient program, Mrs. H. returned to New Jersey and the parties attempted reconciliation.
After approximately six months, in April 2008, the spouses engaged the private mediation services of Robert A. Fall (Judge Fall)[2] to help them with their unresolved marital troubles. Judge Fall's initial role was to help the parties reconcile; these efforts were unsuccessful, and in late 2008, the parties began divorce mediation under Judge Fall's sponsorship. According to Mrs. H., at the first mediation session, Judge Fall told her she needed to retain counsel and supplied her with a list of potential attorneys. The list included Linda L. Piff, Esq., who Mrs. H. ultimately *403 retained. Mr. H. was represented by his current counsel, Peter C. Paras, Esq. After a few mediation sessions, Corrine Campi, Esq. was drafted to serve alongside Piff as Mrs. H.'s co-counsel.
At some point during the mediation effort, R. Joseph Gunteski, CPA, was jointly retained to assist in the financial aspects of the spouses' conciliation discussions. The parties had worked with Gunteski and members of his accounting and consulting firm in the past. Mrs. H. asserted that Gunteski's accounting firm prepared the tax returns for her husband's law practice, and Donald A. Cowen, CPA, a member of that firm, served as the parties' accountant. According to Mr. H., it was Gunteski who had knowledge of the family's financial history and prepared the parties' personal income tax returns for many years. At Piff's suggestion, Mrs. H. interviewed a second accountant to assist in the financial aspects of the mediation, but ultimately decided that he was not needed.

B.
After months of discussions, on February 25, 2009, the parties executed the MSA.[3] In it, they warranted that they were "fully and adequately informed of the financial structure of the marriage, including their incomes, assets, liabilities and expenses." They acknowledged that their respective attorneys had "fully advised them of their rights to use pretrial discovery. . . in order to ascertain, verify and/or confirm the nature and extent of their respective assets and financial conditions." Both spouses confirmed that they had "communicated to their respective attorneys that they [did] not wish to engage in or compel participation in pretrial discovery beyond that which [had] been accomplished and that they [were] satisfied with the disclosures set forth in [the MSA]." Lastly, the MSA noted, "[e]ach party hereby knowingly waives his or her right to further discovery as provided by the Rules of Court."
Additionally, in signing the instrument, both parties represented that the MSA was entered into "voluntarily, without threat, force, coercion or duress being placed upon their informed consent and voluntary act by the other, or by any other person." Importantly, the MSA provided,
[t]he parties each acknowledge that the settlement terms reflected in [the MSA] represent a compromise and negotiated settlement. The parties each acknowledge that they have been informed by their respective counsel of the right to have a court of competent jurisdiction determine all issues arising from the marriage. Each party voluntarily and knowingly waives that right, and accepts the terms of [the MSA] as being final, complete and binding as to property division, support, and the specified incidental issues herein.
Each party acknowledged having a full understanding of the legal consequences of the terms and provisions contained in the MSA, with a belief "that [the MSA] and all of its terms and provisions are fair, just, and equitable." The parties further confirmed that they were represented by independent counsel and were satisfied with the services of such counsel.
*404 The MSA identified Judge Fall as a "third party neutral mediator," and articulated the parties' "great trust and confidence" in his services. Lastly, the MSA expressed the spouses' gratitude for having been "greatly assisted [by Judge Fall] in reaching this [a]greement." Similarly, the MSA identified Gunteski as the parties' "joint accounting expert," confirmed their satisfaction with his work, and thanked him for his services.

C.
Of signal significance to this appeal, the parties also made choices about their children. In the MSA they agreed to be bound by the recommendations of Dr. Charles Katz, Ph.D., who had been retained by them to conduct "a full evaluation of the parties and the children and to render a written report containing recommendations as to the children's best interests, including, but not limited to, recommendations on custody and parenting time."[4] The MSA stated:
The parties further acknowledge and agree that it is in the children's best interests to avoid lengthy, protracted and divisive litigation over custody and parenting time issues and that, after due consideration of the children's best interests and the qualifications and reputation of Dr. Katz, hereby agree to be bound and to abide by the recommendations set forth in Dr. Katz's report and to implement said recommendations immediately upon receipt of Dr. Katz's report.
At the time that the MSA was executed by the parties, Dr. Katz had not yet completed the tasks of investigating, evaluating, and writing a report. To accommodate this lag, the MSAprovided as part of its discussion about Mrs. H.'s anticipated move from Spring Lake to Briellethat "the parties shall mediate with Judge Fall a temporary custody and parenting-time plan if Dr. Katz's report has not been received prior to the closing of title on the Brielle, New Jersey property."

D.
On June 8, 2009, Dr. Katz released his comprehensive ninety-three-page Child Custody Evaluation (the Katz report), which bears a date of seven days earlier. In it, Dr. Katz listed (1) the time he spent evaluating both parties, as well as all seven children;[5] (2) the fifty-seven documents he reviewed, (3) the assessment instruments he administered; and (4) the ancillary contact he consulted. Dr. Katz extensively outlined his interviews with both parties, which included their versions of the events leading up to the current situation and their relationship history. The Katz report contains a surfeit of facts and minutiae, together with copious statements from the parties and their children, which are quoted verbatim or paraphrased in rich detail.
Dr. Katz also administered psychological tests to Mr. and Mrs. H. According to Dr. Katz, the spouses' scores on the parent-child relationship inventory were "essentially equal"; however, the personality tests showed Mrs. H. "would clearly be *405 diagnosed with a Personality Disorder with very prominent narcissistic and histrionic dimensions." Her psychological testing scores reflected "chronic psychological maladjustment" and she "rationalizes her difficulties in life, denies responsibility for her actions, and tends to become hostile, resentful, and irritable." Mr. H. showed no signs of significant personality disorders.
Dr. Katz conducted a group interview with each parent (on succeeding days) and six of the seven children. During the interview with the children and Mr. H., the children portrayed their mother as drinking heavily and described specific incidents of public intoxication and erratic behavior. Dr. Katz's impression of the interview was that the children were not coached and they spontaneously offered incidents depicting their mother in a "highly unflattering light," with none of the children defending her conduct.
During the next evening's interview with Mrs. H. and the children, the children told Dr. Katz that their mother was rarely home, and said that she occasionally drinks and drives. One of the children described an incident where Mrs. H. locked herself in her closet with the four youngest children. Dr. Katz's impression of the interview was Mrs. H.'s inability to "perceive the children's pain about her behavior" and "the essence of her defense is that all of this is Mr. H.'s fault."
Dr. Katz also interviewed the children individually. The Katz report provides a wealth of detail about these interviews and contains abundant direct quotes attributed to the children. There were multiple descriptions of incidents of Mrs. H.'s drunken behavior, as well as her frequent absences from the home. A consistent picture emerged from the children depicting Mr. H. as their primary caretaker who provided meals, made sure they were transported to school, and ensured that they were well cared for.
Dr. Katz reviewed reports from mental health professionals Mrs. H. had seen in 2007 leading up to her treatment at Sierra Tucson, as well as her records from that facility. Dr. Katz found that these records all pointed to Mrs. H.'s struggle with alcohol. In addition, Dr. Katz spoke with a therapist who had been treating the family, and reviewed the children's academic histories, finding the younger children, who Mrs. H. supervised in the morning, had high instances of tardiness, likely due to her inadequate supervision and structure.
Dr. Katz also reviewed a report from Mrs. H.'s therapist, but found it did not appear to be an objective analysis and instead read like a "personal testimonial."[6] Most significantly, it was not consistent with Dr. Katz's observations of the family. Various police reports were also reviewed, which supported information provided from the family about Mrs. H.'s erratic behavior and history of alcohol abuse. The Katz report also discussed several other letters, emails, and private investigator reports which tended to show more of Mrs. H.'s unpredictable behavior and excessive consumption of alcoholic beverages.
The Katz report contained a five-page section devoted to its conclusions and recommendations. It ultimately determined that Mr. H. is "a psychologically well-functioning individual" whereas his wife is "a significantly psychologically impaired individual." Dr. Katz found Mr. H. was "far more credible" than his spouse during the *406 evaluation, and the information gleaned from the children, professionals, and virtually all of the other sources supported Mr. H.'s reported observations of his wife's behavior.
Dr. Katz recommended that Mr. H. be designated parent of primary residence and given sole legal custody because Mrs. H. was incapable of co-parenting. The Katz report noted that "Mr. H. will do what needs to be done in promoting the children's relationship with their mother." Because of her "poor level of parenting" (explicated in extreme detail in the Katz report), Dr. Katz also recommended that Mrs. H. not have overnight visitation in her new home for a few months. Nevertheless, he felt that Mrs. H. should have two weekdays a week with the children, in order "to be able to demonstrate that she can be present with the children and exclusively devoted to meeting their needs while they are with her." Dr. Katz also opined that consideration should be given to expanding her time to overnight visits if she "demonstrates consistent involvement with the children" during her visits. Most significantly, Dr. Katz cautioned, "[i]f there are any indications that she is drinking before or during the children's time with her, then her parenting time should be suspended until arrangements can be made for supervised visitation." An updated evaluation in six months was recommended to evaluate Mrs. H.'s readiness to have visitation expanded to overnights.
One day after issuing his report, on June 9, 2009, Dr. Katz attended a two-hour multi-party conference with the parties, their attorneys, and Judge Fall to discuss the content and recommendations of his chronicle. According to Dr. Katz, Judge Fall and Piff told him during that conference that Mrs. H. had been recently drinking in the presence of the children at her new residence.[7] Moreover, by Dr. Katz's account, Mrs. H.'s counsel was trying to facilitate her entry into an inpatient treatment program.
Dr. Katz certified that the information was presented to him "as established fact," and no one asked Dr. Katz to interview the children. Campi, however, co-counsel for Mrs. H., disputed this version of events, certifying that Mrs. H. denied the allegation of consuming alcoholic beverages in the presence of the children.
On June 12, 2009, Dr. Katz emailed Campi and Paras supplemental recommendations (the Katz supplement), opining, "I am firmly of the opinion that Mrs. H. is in immediate need of inpatient treatment for her alcohol and trauma/personality disorder problems." He further contended, "I see a clear need for [Mrs. H.] to have supervised visitation with her children" until she decides on her course of treatment.

E.
According to the MSA, Mrs. H. was initially to receive $8,000 per month in alimony, plus a percentage of Mr. H.'s bonus from his law practice for twenty-four months; the $8,000 base figure increased to $10,000 after twenty-four months. Mrs. H. also obtained $3.3 million as equitable distribution, and retained $600,000 worth of jewelry and $200,000 worth of clothing and fur coats. Mr. H. received title to the marital home. Artwork and furniture were divided between the parties. Mrs. H. waived all claims in *407 her husband's interest in his law practice, certain other properties owned by him, and his retirement savings.

II.
Following the execution of the MSA, the parties' relationship as litigants was no less contentious than their marriage. Mr. H. fired the opening salvo by filing a complaint seeking dissolution of the marriage on May 5, 2009. This was only ten weeks following the execution of the MSA, but still one month before the Katz report was issued. Mrs. H.'s answer and counterclaim was filed on July 16, 2009.
Shortly after the Katz report and Katz supplement were made known to the parties, Mrs. H. sought emergency relief from the court. She filed an order to show cause seeking a mandatory injunction requiring compliance with the initial Katz report and a declaration that the Katz supplement and its recommendation for supervised visitation were ineffective. Mr. H. filed a cross-motion seeking certain economic relief, as well as requesting an immediate determination that the court grant a judgment of divorce incorporating the MSA. After treating both sides' voluminous submissions as motions, the Family Part entered an order on September 11, 2009, which denied all parties' applications, thereby leaving the Katz report and Katz supplement intact.
Two months later, Mr. H. filed a motion seeking a declaration that the MSA was specifically enforceable. He also requested several other aspects of economic relief, including the payment of child support from Mrs. H., the calculation of putative arrearages, and the reallocation of counsel fees. Mrs. H. responded with a cross-motion that also sought economic relief, including the establishment of an amount for child support, payment of alimony, permission to file notices of lis pendens against properties of Mr. H., and for counsel fees. Most notably, she sought to set aside the entire MSA.
The motion court entered three orders on January 15, 2010, which disposed of the parties' applications. First, the court rejected Mrs. H.'s application to set aside the MSA's financial attributes, but granted her request as to the MSA's provisions regarding child custody and parenting time. Nevertheless, the court insisted upon interim adherence to the Katz supplement's recommendations until the custody dispute could be resolved in the future. A reunification therapist for the children was appointed, and the court required that the children be made available for evaluative purposes with Mrs. H.'s custody and parenting time expert.
The second order specifically enforced the financial provisions of the MSA, and set Mrs. H.'s obligation to pay child support at $1,500 per month. It tracked the first order by requiring supervised parenting time for Mrs. H. until further order of the court. It denied the application for an immediate judgment of divorce.
The third order confirmed the amount of child support and alimony, denied permission to file notices of lis pendens, and denied reallocation of counsel fees.
With swift certainty, both sides filed motions for reconsideration. These motions were orally argued on March 5, 2010, resulting in the two orders that are challenged on appeal. In its first order, the Family Part denied all of the relief that was sought by Mrs. H. The court noted that reconsideration of the financial aspects of the MSA was unwarranted because Mrs. H., with the representation of two attorneys, "affix[ed] her imprimatur to the [MSA]" and "embraced" it knowing that it contained extensive language confirming that the parties understood their *408 rights, jointly selected Mr. Gunteski, and waived all further discovery.
The motion court next addressed the MSA's treatment of child custody and parenting time issues. The court found that based on the provision in the MSA, the parties agreed to be bound by Dr. Katz's recommendations, and that "th[e] matter was concluded upon the submission of the supplemental report on June [] 12, 2009." Therefore, in reliance upon the court's understanding of pipeline retroactivity as provided in our opinion in Johnson v. Johnson,[8] the dictates of Fawzy did not apply because the parties' case "was not in the pipeline . . . at the time of [the] Fawzy v. Fawzy ruling [on July 1, 2009]." Nevertheless, the Family Part added that in light of the "rather extensive" nature of Dr. Katz's report, including the interviews of all of the children, "a court under Fawzy could find a sufficient record . . . even though there was not testimony . . . in the same vein as there would be in arbitration . . . [s]o that forms part of [the court's] ruling here today."
Having decided that the entire MSA was enforceable, the courtover Mrs. H.'s objection tooktestimony regarding the cause of action for divorce. Mr. H. testified to the irreconcilable differences that arose between himself and his spouse, as well as the extent of their duration. He averred that he signed the MSA "knowingly, voluntarily, freely and with the benefit of independent counsel." When Mrs. H. testified, she confirmed the existence of irreconcilable differences for more than six months, and that she signed the MSA, which had been modified several times before February 25, 2009. She further testified that on the day she signed the MSA, she had been at Mr. Gunteski's office for ten-and-a-half hours, along with Judge Fall, Campi, Piff, Paras, and her husband.
Mrs. H. continued that she did not know Dr. Katz's recommendations would be binding until halfway through the mediation, and that had she known his recommendations would be binding she would not have so agreed. She also testified that she believed there were additional assets not represented in the MSA that would be addressed subsequently, and claimed to have "had no idea" what waiving pretrial discovery meant. While she admitted to signing the MSA voluntarily, she asserted that "[a]t the time [she] signed it," she did not believe the MSA was a fair or reasonable resolution of the disputes and differences between the parties.
The court considered the testimony and found that the parties had pled and proved a cause of action for divorce. It then again found that the MSA was enforceable, and indicated its satisfaction that the parties had voluntarily entered into the agreement with "full knowledge of its contents and with the advice of counsel." The court stated, "the parties have accepted it as fair and reasonable . . . based on the statements made in the [MSA]." Accordingly the Family Part issued the JOD reflecting its decision. This appeal followed.

III.
Mrs. H. challenges the JOD's incorporation of the MSA on two grounds: (1) there was no appraisal and valuation of the marital estate, which precluded the creation of a fair and enforceable agreement and (2) the Family Part abused its discretion by barring discovery of the components of the parties' agreement. We are not persuaded by these arguments.

*409 A.
We begin with first principles. Family courts have special jurisdiction and expertise in family matters, and therefore, appellate courts should accord deference to the fact finding of the Family Part. Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998). "We grant substantial deference to a trial court's findings of fact and conclusions of law, which will only be disturbed if they are manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence." Crespo v. Crespo, 395 N.J.Super. 190, 193-94, 928 A.2d 833 (App.Div.2007) (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)) (quotations omitted).

B.
Settlement of litigation ranks high in the pantheon of public policy. This is particularly true in matrimonial matters, where settlement agreements, being "essentially consensual and voluntary in character[,]. . . [are] entitled to considerable weight with respect to their validity and enforceability" in equity, as long as they are fair and just. Petersen v. Petersen, 85 N.J. 638, 642, 428 A.2d 1301 (1981) (citing Carlsen v. Carlsen, 72 N.J. 363, 370-71, 371 A.2d 8 (1977)); see also Lepis v. Lepis, 83 N.J. 139, 153-54, 416 A.2d 45 (1980); Berkowitz v. Berkowitz, 55 N.J. 564, 569, 264 A.2d 49 (1970); Schlemm v. Schlemm, 31 N.J. 557, 581-82, 158 A.2d 508 (1960).
"`[S]eparation agreements . . . are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not against public policy.'" Konzelman v. Konzelman, 158 N.J. 185, 194, 729 A.2d 7 (1999) (quoting Gordon v. Gordon, 342 Md. 294, 675 A.2d 540, 544 (Md.1996)); see also Weishaus v. Weishaus, 180 N.J. 131, 143, 849 A.2d 171 (2004). Although we recognize that "incorporation of a PSA into a divorce decree does not render it immutable, nor its terms solely governed by contract law, nevertheless, if found to be fair and just, it is specifically enforceable in equity." Eaton v. Grau, 368 N.J.Super. 215, 224, 845 A.2d 707 (App.Div.2004) (citations omitted).
In Ocean County Chapter, Inc. of Izaak Walton League of America v. Department of Environmental Protection, 303 N.J.Super. 1, 10, 696 A.2d 25 (App.Div.1997), we noted:
Settlements permit parties to resolve disputes on mutually acceptable terms rather than exposing themselves to the uncertainties of litigation. "Settlements also save parties litigation expenses and facilitate the administration of the courts by conserving judicial resources." Consequently, settlements are generally upheld absent clear and convincing evidence of fraud or other compelling circumstances.
[Ibid. (citations omitted).]
In AT & T Corp. v. Township of Morris, 19 N.J.Tax 319, 322 (Tax 2000), the Tax Court listed as other compelling circumstances "mutual mistake, undue haste, pressure or unseemly conduct in settlement negotiations." In Liguori v. Allstate Insurance Co., 76 N.J.Super. 204, 211, 184 A.2d 12 (Ch.Div.1962), the Chancery Division noted, "`[i]t is a matter of common knowledge that fair and reasonable settlements can generally be made at much less than the financial burden imposed in litigating claims.'" Ibid. (quoting Alford v. Textile Ins. Co., 248 N.C. 224, 103 S.E.2d 8, 12 (1958)).
Thus, settlementsthe parties' choice of the least unfavorable alternativesoccur for many reasons other than certainty of result. Settlements are made to obviate the pressures of litigation, to avoid the *410 expense of counsel fees, and to avoid the cost and delay of appeals. In this case, the parties themselves expressed another irresistible reason, a non-economic reason, to settle: to spare their seven children the heartbreak of having their innermost feelings about their parentseven if reviewed in cameraforensically analyzed. The MSA appears designed, in part, to laudably change the destiny of the parties' children so that such fortune is not eroded by
marital difficulties and discords between the parties. These dissensions, through want of mutual forbearance and the exercise of a spirit of forgiveness, are prolonged to a degree that promises permanent desolation to family that was once a happy one; and that bids fair to entail a heritage of frustration, ambiguity of loyalty, and unhappiness upon the children, whose happiness and welfare both parents claim to be striving.
[Quinn v. Johnson, 247 N.J.Super. 572, 580, 589 A.2d 1077 (Ch.Div.1991).]
To this end, then, Mr. and Mrs. H. turned to mediation to resolve their differences and spare their children, and they succeeded.
"Mediation is now an accepted process in the resolution of family disputes[.]" Lerner v. Laufer, 359 N.J.Super. 201, 216, 819 A.2d 471 (App.Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003). It is understood that "[a] mediated divorce settlement may well look substantially different on the same facts than would such a settlement hammered out in adversarial proceedings." Ibid. In light of that understanding, "court[s] daily approve[] [divorce] settlements upon the express finding that it does not pass upon the fairness or merits of the agreement, so long as the parties acknowledge that the agreement was reached voluntarily and is for them, at least, fair and equitable." Id. at 217, 819 A.2d 471 (citation omitted).
Here, the parties exercised self-determination to limit the scope of discovery contemplated in Lerner by waiving formal discovery, which included the use of experts to conduct valuations. The parties jointly agreed, through counsel, to use Gunteski as the accounting expert, and Mrs. H. elected to not use her own expert. Gunteski, and the parties, clearly provided an effective method for evaluating the marital estate, which Mrs. H. unflinchingly accepted in signing the MSA.
Mrs. H. claims that Merns v. Merns, 185 N.J.Super. 529, 449 A.2d 1337 (Ch.Div. 1982) and Marschall v. Marschall, 195 N.J.Super. 16, 477 A.2d 833 (Ch.Div.1984) support her argument that only after deployment of full and broad discovery in search of comprehensive valuations of all of the parties' assets can a fair and equitable settlement be achieved. We find that neither Merns nor Marschall stands for such unrealistic propositions.
Lerner is the proper anchor of decisional law under which to evaluate whether the parties were required to engage in the type of discovery urged by Mrs. H. We are satisfied that Mrs. H. bargained for, and received, all that she was due as a result of her conceded voluntary execution and acceptance of the MSA.
The determination of whether a mediated settlement agreement is fair and equitable is accomplished through considerations "such as the adequacy of the agreement at inception, the presumed understanding of the parties at that time, . . . the manner in which the parties acted and relied on the agreement as well as the . . . principle that agreements by their very nature carry with them a stability that must be respected at the time of enforcement." Glass v. Glass, 366 N.J.Super. *411 357, 372, 841 A.2d 451 (App.Div.), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004).
If a marital "settlement agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside." Peskin v. Peskin, 271 N.J.Super. 261, 276, 638 A.2d 849 (App.Div.), certif. denied, 137 N.J. 165, 644 A.2d 613 (1994). Accordingly, absent "unconscionability, fraud, or overreaching in the negotiations of the settlement, . . . no legal or equitable basis exists to reform the parties' property settlement agreement." Miller v. Miller, 160 N.J. 408, 419, 734 A.2d 752 (1999).
In Miller, wife claimed she "did not have the requisite information to make an informed decision regarding her waiver of the restricted stock." Id. at 418, 734 A.2d 752. There, wife had been represented by two lawyers specializing in family law, was advised by an accountant, and had told the trial court she understood the agreement and was not rushed into signing it. Pursuant to the terms of the agreement, wife received $1,000,000 in equitable distribution, plus alimony, and a share of husband's pension. Id. at 418-19, 734 A.2d 752. The Court therefore held there was no basis to reform the agreement. Id. at 419, 734 A.2d 752.
By contrast, where the attorney who mediated the parties' settlement was related to husband, the parties did not have independent counsel, and wife had no idea what the family's finances were, we found wife's "interests were not properly or adequately addressed in the agreement" and ordered modification. Guglielmo v. Guglielmo, 253 N.J.Super. 531, 542, 602 A.2d 741 (App.Div.1992). A settlement agreement was also found unconscionable "based on the totality of the circumstances" where wife was not represented by counsel, at husband's urging, wife had no experience in financial matters, and the terms of the agreement clearly did not reflect the stated intent of a fifty-fifty split of the marital estate. Addesa v. Addesa, 392 N.J.Super. 58, 69, 72-73, 919 A.2d 885 (App.Div.2007). In Addesa, unlike the present case, new facts came to light after the property settlement agreement was executed that showed the valuations used for some of husband's assets were inadequate. Id. at 68, 919 A.2d 885.
Here, the MSA is the antithesis of the agreement parsed in Guglielmo. Mrs. H. was provided with $3.3 million in cash, $800,000 in clothing and jewelry, plus artwork and furniture. Her incremental needs will be provided by substantial alimony that increases over time. The MSA is comprehensive, as it addresses in excruciating detail most everything from alimony to taxes. Mrs. H.'s assertion that she lacks the capacity to determine whether the MSA treated her fairly due to the lack of discovery is belied by the generous tangible benefits that the agreement bestowed upon her. Her attempt to elevate a conjectural claim that the MSA willfully blinded her to the supposed true value of the marital estate is sophistry, and we reject it.
At the time the MSA was signed, both parties outwardly manifested that they understood fully the terms of the agreement. Mrs. H. was advised by two attorneys, and successfully engaged in negotiations on the day of the signing, which clearly weighs in favor of a finding that she was fully engaged with, and understood, the agreement. The parties also relied on the MSA as property was sold and a loan obtained in order to pay portions of the equitable distribution settlement. Notwithstanding her protestations to the contrary, the record clearly shows that the MSA was fair and equitable to Mrs. H. when viewed *412 under the lens of family litigation settlements.
There is also no indication that the MSA is unconscionable. Nothing in the record, aside from Mrs. H.'s self-serving contentions, indicates that she was kept in the dark concerning the supposed true value of the marital estate. It appears clear that Gunteski, with the help of the parties and their attorneys, conducted an agreed-upon streamlined valuation of the marital property. Gunteski's method for appraising the business assets and properties is not in the record, however, unlike Addesa, the record does not reflect that Gunteski was incapable of providing accurate valuations of the assets based upon the parties' personal and business financial records, with which he was familiar. Most importantly, Mrs. H. voluntarily signed the MSA, which stated that she was provided full and adequate disclosure of the marital property. Her after-the-fact remorse entitles her to no remedy because it lacks provenance in the law, and more importantly, in equity.
Under the totality of the circumstances, the Family Part's determination that the financial terms of the MSA were binding is fully supported. There is simply nothing of merit in the record to support Mrs. H.'s naked contention that it was unfair and inequitable through want of due diligence. As noted, Mrs. H. received all that she was due.

IV.

A.
We next turn to the child custody and parenting time issues implicated in this appeal. We part company with the Family Part over the pipeline retroactivity of Fawzy, but it does not change the ultimate result.
At the time of its decision regarding the enforceability of the MSA, in March 2010, Fawzy had been decided for over nine months. Similarly, at that time, our decision in Johnson was more than two months old. The Family Part discounted Johnson's discussion of Fawzy's pipeline retroactivity because it believed that the H.s were already out of the pipeline when Fawzy was decided on July 1, 2009. This conclusion was based upon the view that child custody and parenting time issuescontrolled as they were by the MSAwere finalized (and out of the figurative pipeline) by dint of the Katz report and Katz supplement, which were issued at the latest on June 12, 2009, three weeks before Fawzy. This determination by the Family Part (and the parties) misunderstood the principle of pipeline retroactivity and requires clarification.
The bedrock principles of decisional law retroactivity were spelled out in State v. Knight, 145 N.J. 233, 678 A.2d 642 (1996), a case involving criminal procedure:
This Court has four options in any case in which it must determine the retroactive effect of a new rule of criminal procedure. See State v. Burstein, 85 N.J. 394, 402-03 [427 A.2d 525] (1981). The Court may decide to apply the new rule purely prospectively, applying it only to cases in which the operative facts arise after the new rule has been announced. Ibid. Alternatively, the Court may apply the new rule in future cases and in the case in which the rule is announced, but not in any other litigation that is pending or has reached final judgment at the time the new rule is set forth. Id. at 403 [427 A.2d 525]. A third option is to give the new rule "pipeline retroactivity," rendering it applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal. Ibid. Finally, the Court may give the new rule complete retroactive effect, applying it to all cases, including *413 those in which final judgments have been entered and all other avenues of appeal have been exhausted. Ibid.

[Id. at 249, 678 A.2d 642.]
We are only concerned about the Court's third option, pipeline retroactivity, in this matter.
In the civil context, pipeline retroactivity of a new rule of law contemplates that three classes of litigants will be beneficiaries: those in all future cases, those in matters that are still pending, and the particular successful litigant in the decided case. See R.M. v. Supreme Court of N.J., 185 N.J. 208, 230-31, 883 A.2d 369 (2005) (applying pipeline retroactivity to new rule of confidentiality in all pending attorney disciplinary matters); Beltran v. DeLima, 379 N.J.Super. 169, 176-77, 877 A.2d 307 (App.Div.2005) (applying pipeline retroactivity to DiProspero[9] and Serrano[10] as "applicable to all prejudgment matters pending in the trial courts and to those matters that [were] on direct appeal").
In our opinion in Johnson, we held that the Supreme Court's validation of arbitration as a means of resolving child custody and parenting time issues was entitled to pipeline retroactivity. Id. at 174, 984 A.2d 912 ("[W]e find that pipeline retroactivity is appropriate here so that previous awards will not be disturbed but currently litigating parties, including those here, will have the benefit of the Court's decision in Fawzy to protect the best interests of children."). Although the Supreme Court reversed our determination that the arbitral award failed to comport with Fawzy's procedures, Johnson, supra, 204 N.J. at ___, 9 A.3d 1003, the Court did not disturb our conclusion regarding pipeline retroactivity. Accordingly, the MSA is governed by Fawzy, as tempered by Johnson, because at the time the Family Part decided the MSA's enforceability, the parties were still litigating their dispute and perforce were within the metaphorical pipeline.

B.
We have saved for our penultimate analysis the significant issue of whether the Family Part was correct in enforcing the MSA's treatment of child custody and parenting time issues. At the outset, we note a significant difference between Fawzy, Johnson, and this case: the parties did not use the word arbitration in the MSA to describe the means of resolving their differences concerning their children's welfare. In Fawzy, the parties expressly committed themselves to arbitrate, which was confirmed in an order entered by the Family Part. Fawzy, supra, 199 N.J. at 465, 973 A.2d 347. The Court held that this implicated the statutory framework of New Jersey's version of the Uniform Arbitration Act, N.J.S.A. 2A:23B-1 to -32 (Arbitration Act). In Johnson, the parties proceeded under the New Jersey Alternative Procedure for Dispute Resolution Act, N.J.S.A. 2A:23A-1 to -19 (APDRA). Johnson, supra, 204 N.J. at 539, 9 A.3d 1003. Our court has recently come to the conclusion that in the absence of an express designation in an agreement to arbitrate marital financial issues, the Arbitration Act governs the arbitration. Manger v. Manger, 417 N.J.Super. 370, 374-75, 9 A.3d 1081 (App.Div.2010).
The MSA does not fit neatly into either statutory framework. However, the Court noted in Johnson, "[w]hat Fawzy requires is the existence of an arbitration record against which the claim can be tested. That is so whether the arbitration is conducted *414 under the Arbitration Act, APDRA, or under specific procedures agreed upon by the parties." Johnson, supra, 204 N.J. at 534, 9 A.3d 1003 (emphasis added).
As already noted, Paragraph 21 of the MSA provides:
The parties further acknowledge and agree that it is in the children's best interests to avoid lengthy, protracted and divisive litigation over custody and parenting time issues and that, after due consideration of the children's best interests and the qualifications and reputation of Dr. Katz, hereby agree to be bound and to abide by the recommendations set forth in Dr. Katz's report and to implement said recommendations immediately upon receipt of Dr. Katz's report.
We are satisfied that this is a sufficient memorialization of an agreement to provide "specific procedures," closely aligned with arbitration, to resolve the parties' child custody and parenting time issues. See N.J.S.A. 2A:23B-6(a). It recognizes the alternative of litigation, and evinces the parents' choice to minimize harm to the children while furthering their best interests. Furthermore the totality of the MSA satisfies Fawzy's requirements that:
it must state in clear and unmistakable language: (1) that the parties understand their entitlement to a judicial adjudication of their dispute and are willing to waive that right; (2) that the parties are aware of the limited circumstances under which a challenge to the arbitration award may be advanced and agree to those limitations; (3) that the parties have had sufficient time to consider the implications of their decision to arbitrate; and (4) that the parties have entered into the arbitration agreement freely and voluntarily, after due consideration of the consequences of doing so.
[Id. at 482, 973 A.2d 347 (footnote omitted).]
We further conclude that actual implementation of the MSAeven though Dr. Katz eschewed the formal designation as an arbitrator in favor of his label of joint expertwas in conformity with the more flexible standards announced in Johnson. In this case, Dr. Katz produced a thorough and complete record of all of the evidence he considered, he provided a rich and detailed recapitulation of every interview and observation he conducted, and he rendered a full explanation and justification for each of his recommendations. The supplemental recommendations that he reached after June 9, 2009, do not suffer from any of the shortcomings argued by Mrs. H. All of Dr. Katz's work satisfies the spirit of Fawzy and Johnson, and constitutes an acceptable substitute for punctilious adherence to the procedural niceties sketched out in those opinions.
We also note that Mrs. H.'s applications to the Family Part failed to raise the specter of harm to any of the children as a result of Dr. Katz's determinations. Fawzy clearly provides a litigational outlet from an arbitration award that produces a threat of harm to a child. Id. at 478-79, 973 A.2d 347. The motion record reviewed by us does not support the view that intervention by the Family Part was triggered by any of Mrs. H.'s allegations that were primarily directed to her perceived harm, rather than that of the children.
Before we leave the subject, we note that our ruling, while of broad significance to this family, may be of narrow application. The question of the resolution of child custody and parenting time issues in this case was limited by the slender issue of the enforceability of the MSA and its incorporation into the JOD. We have not been presented with the question of how to interpret the MSA vis-à-vis future child *415 custody and parenting time disputes. The only issue that we have been presented with relates to the Katz report and Katz supplement, circa 2009.
We further observe that Paragraph 79 of the MSA provides for the resolution of prospective disputes as follows:
The parties agree that if a dispute arises in connection with the provisions of this Agreement or contained in a related judgment, order or agreement, regarding financial and child-related issues, they will attempt to resolve the dispute through personal discussion. If this fails, then the parties agree to submit their disputes to Benchmark [R]esolution Services, LLC for resolution. If that fails, then either party shall have the right to address the matter to the court on notice.
[emphasis added.]
"It goes without saying that parties are not bound to arbitrate on an all-or-nothing basis, but may choose to submit discrete issues to the arbitrator." Fawzy, supra, 199 N.J. at 482, 973 A.2d 347. We decline to predict the timing, complexion, or context of the possible myriad disputes that may arise between the parties as they attempt to comport themselves as individuals and parents. Accordingly, we leave it to the ordinary processes of the machinery of dispute resolution to sort out what may befall these parties.

V.
Mrs. H.'s last point on appeal relates to Judge Fall. She has argued that Judge Fall's role as a mediator was compromised because of the earlier services he provided to the parties in their attempt at reconciliation. She further expressed her discomfort with "Judge Fall's role changing." Then, specifically citing Rule 1:40-4(f)(1)(A),[11] Mrs. H. asserted the following:
Despite his good intentions and kindness to the parties, given the disparate bargaining power, education levels, and life experience of the parties, [Mrs. H.] believes that R[ule] 1:40-4 required that Judge Fall not accept his suggested role as mediator of the parties' marital differences.
In addition, in an attempt to overthrow the efficacy of the mediated MSA, Mrs. H. sprinkled her appellate brief with innuendo"Judge Fall is acquainted with [Mr. H.] and [Mr. H.] with Judge Fall (not surprising given [Mr. H.'s] occupation and Judge Fall's service on the Bench)"and with speculation"[Mrs. H.'s] [r]ejecting the recommendation of a reconciliation facilitator, social friend and now divorce mediator who is also a retired judge of the [A]ppellate Division . . . perverted the mediation process in a way that worked to [Mrs. H.'s] detriment." We are unmoved by these unfounded arguments, and find the record barren of anything relating to the conduct of the mediation or the mediator to give us pause for concern.
Indubitably, a mediator conducting himself pursuant to the UMA must be, like Caesar's wife, above suspicion. See Isaacson v. Isaacson, 348 N.J.Super. 560, 575, 792 A.2d 525 (App.Div.), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002). However, illusory or metaphysical doubts about the performance of a mediator's services will not suffice to engender an erosion of confidence in the product of such process. Nothing has been brought to our attention *416 in this case that commends our post hoc intervention, notwithstanding the subjective dissatisfaction of one of the litigants.
The advent of mediation and other alternative dispute resolution methods as tools to assist parties in resolving their disputes as early as possible and with the least amount of financial and emotional strain is an admirable and worthwhile effort of the court system. Ultimately, however, in an adversarial system with limited resources, the success of mediation is dependent on the good faith, reasonableness and willingness of the litigants to participate. Many are able to do so successfully. However, litigants are not fungible. For one reason or another, some are simply not good candidates for case resolution through good-faith alternative dispute resolution methods such as mediation.
[Lehr v. Afflitto, 382 N.J.Super. 376, 398, 889 A.2d 462 (App.Div.2006).]
Here, the parties gave themselves an opportunity to expeditiously resolve their conflicts "without the cost and burden of plowing through the adversarial system to achieve a final result so that they could move on with their lives." Ibid. That happened here, at least for a while, and we will not disturb it.
Affirmed.
NOTES
[1] In the interest of completeness, we note that a third order was entered on March 5, 2010, which denied Mrs. H.'s motion for reconsideration of a January 15, 2010 order. Mrs. H.'s Notice of Appeal does not expressly seek review of this third order, but her appellate arguments touch and concern its disposition.
[2] Robert A. Fall was a Judge of the Superior Court of New Jersey for twenty years, beginning his judicial service in 1986. He was assigned to the Appellate Division from 1998 until his retirement in 2006, and was on recall duty commencing in June 2009 until his permanent resignation in May 2010. See Robert A. Fall, Governor, in Rejecting Wallace, Misrepresented Justice's Record, Says Former Judge, 200 N.J.L.J. 401 (2010). At all times relevant to this appeal, Judge Fall was retired from the Judiciary and engaged in private endeavors.
[3] Two versions of the MSAboth signed by the parties and acknowledged by their respective attorneyswere provided to us. The first version is typed, but contains many hand-written notations on it, likely the result of negotiations that culminated on the date it was signed. This marked-up version of the MSA bears the parties' initials on almost every page. The second version appears to substantially incorporate the handwritten revisions from the earlier version into typescript, but it is not initialed on each page. Both versions were incorporated into the JOD at the insistence of the parties' attorneys.
[4] Dr. Katz viewed his role as a "joint expert." He rebuffed being retained to function as the "final authority on the resolution of the child custody issues." He eschewed knowledge of being vested with a role other than as a joint expert, claiming, "[b]ased on my understanding, no one was vesting me with the authority to be the `final and last word about custody.'"
[5] The Katz report documents spending fifteen hours and forty-five minutes stretched over seven sessions with Mrs. H.; seventeen hours spanning ten sessions with Mr. H.; and an aggregate of ten hours and thirty minutes spent with the children.
[6] Mrs. H. faults Dr. Katz for relying solely on this report and not taking the time to personally speak with her therapist.
[7] Dr. Katz indicated that the information about Mrs. H.'s consumption of alcoholic beverages in the presence of the children was not first presented to him by Mr. H. Rather, Dr. Katz learned of it from Judge Fall and Piff, who "accepted the information that Mrs. H. had been drinking as credible and true," which in turnbased upon their presentationwas accepted by Dr. Katz.
[8] Johnson v. Johnson, 411 N.J.Super. 161, 984 A.2d 912 (App.Div.2009), rev'd, 204 N.J. 529, 9 A.3d 1003 (2010).
[9] DiProspero v. Penn, 183 N.J. 477, 874 A.2d 1039 (2005).
[10] Serrano v. Serrano, 183 N.J. 508, 874 A.2d 1058 (2005).
[11] We question the applicability of this Rule where the mediation was privately initiated and conducted without judicial supervision. However, the Uniform Mediation Act, N.J.S.A. 2A:23C-1 to -13(UMA), contains a nearly-identical disclosure provision to the cited Rule. See N.J.S.A. 2A:23C-9(a)(1).