**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0806-17T3

K.S.,

      Plaintiff-Respondent,

v.

J.S.,

      Defendant-Appellant.

_____

> Argued January 16, 2019 – Decided January 17, 2020
>
> Before Judges Nugent and Mawla.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-0106-17.
>
> Frank A. Louis argued the cause for appellant (Louis & Russell, attorneys; Frank A. Louis, on the briefs).
>
> Harry J. Levin argued the cause for respondent (Levin Cyphers, attorneys; Harry J. Levin, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Defendant, J.S., appeals from a Family Part order that denied his motion to have a property settlement agreement (PSA) he signed nearly three years earlier declared invalid.[1] The trial court determined the PSA was not unfair, inequitable, or unconscionable. Because the motion record supports this determination, we affirm.

## I.

### A.

After more than eighteen years of marriage and the birth of the parties' two children, defendant asked for a divorce and plaintiff filed a divorce complaint on May 14, 2014, citing irreconcilable differences. Five days later, on May 19, her attorney mailed a copy of the filed complaint and an acknowledgement of service to the attorney defendant had retained. The trial court conducted a case management conference on July 16, 2014, and signed a consent order. The order placed the case on a standard track and identified as issues in dispute child support, alimony, equitable distribution, counsel fees, medical insurance, and life insurance. The order referred the parties to "Custody/Parenting Time Mediation," noted neither party had filed a case

---

[1] We use initials to protect the parties' privacy.

information statement (CIS), and directed each party to file a CIS by a specified date.

The consent order also set discovery deadlines for the exchange of interrogatories and document demands and completion of depositions. The parties were ordered to produce the following:

> [P]roof of bank account balances, retirement accounts, including 401(k) or IRA's or other records, by September 23, 2014. Plaintiff shall produce proof of all insurance proceeds received for claims made on the marital home due to Superstorm Sandy by August 13, 2014. Plaintiff shall provide proof of any and all documents related to all her business interests for the past four (4) years, including corporate documents, tax returns, list of shareholders, partners, trade names, etc., by August 13, 2014.

The order set dates for appraisals to be completed and required plaintiff to provide existing appraisals and documentation concerning pre- and post-Super Storm Sandy values of the marital home the storm had destroyed. Last, the order scheduled an Early Settlement Panel for October 21, 2014.

One week later, on July 28, 2014, defendant signed the PSA now in dispute. Plaintiff signed the PSA on September 25, 2014.

The PSA declared that "in consequence of the dispute and unhappy differences between them, the parties have separated and are living separate and apart from each other." The PSA stated, "the parties desire to make provisions

3

for resolution of all outstanding economic issues between themselves including, but not limited to, support and distribution of assets." According to the PSA, both parties were represented by counsel, and each party was "entering into this Agreement voluntarily and with full knowledge [of] the income and property of each other." In addition, the PSA recited that "both parties fully understand all of the provisions of this Agreement and believe them to be fair, just, adequate and reasonable and accordingly accept such provisions freely and voluntarily."

The PSA included a waiver of claims against estates, granted each party the right to dispose of his or her property, and provided that each party waived any and all rights "to share in the property or the estate of the other party as a result of the marital relationship, including but not limited to, equitable distribution of property . . . ." Paragraph 2.13, entitled "Discovery," provided:

> The parties represent that each of them has candidly and fully disclosed to the other all of their income, assets and liabilities as of the execution of this Agreement. Each further warrants and represents that he or she, as the case may be, has had the opportunity to be advised by counsel of their choosing and the right to hire experts, take depositions or to use such other tools of discovery as may be available, and each party has agreed to waive the right to complete formal discovery proceedings. Both parties further acknowledge they have been advised of the risks inherent in such a waiver but they deem the terms and provisions of this Agreement and the guaranteed aspects thereof to the Wife and Husband to be fair and equitable and that the

4

expense associated with completion of formal discovery are unwarranted and that the disclosure provided by the Husband to the Wife and the Wife to the Husband has been adequate to permit each party to make an informed and voluntary judgment as to the fairness of this Agreement.

Concerning reconciliation, the PSA provided:

If the parties, after the effective date of this Agreement, cohabit with each other regularly, sporadically or temporarily, or if they reconcile, the Agreement, nevertheless, shall continue in full force and effect until modified, altered or terminated by an Agreement in writing to such effect, signed by each of the parties hereto. In addition, neither party has represented to the other, prior to the execution of this Agreement, that there is any prospect of reconciliation and no promises or inducements have been offered by one party to the other in this regard.

The parties agreed that they would have joint legal custody of the children. Plaintiff was designated as "parent of first residence of the minor children," and defendant was designated as "parent of second residence of the minor children." All major decisions concerning the health, safety, education and welfare of the children were to be jointly made.

The parties also agreed in the PSA that neither would be responsible for payment of child support, but both would "equally contribute to the financial well-being of the children and have parenting time that obviates the need for any formal child support arrangement." Although recognizing a "joint, but not

5

necessarily equal, obligation to provide a college education for their children," the parties agreed defendant would not be responsible for college costs. Both parties agreed to cooperate in assisting the children in applying for scholarships, loans, and grants. This provision was "based upon the respective financial position of the parties, including pre-marital and inherited assets of [plaintiff]. Further, the foregoing was considered an exchange for the parties['] agreement with regard to the marital residence. . . ."

Concerning the marital residence, the parties acknowledged in the PSA the residence "was completely destroyed as a result of Superstorm Sandy." The parties also acknowledged plaintiff had "applied for [g]rants, loans, debt relief, loan forbearance, modifications and the like with regard to the . . . property." Thus, the parties agreed that plaintiff would retain possession of the property and be responsible for all debt associated with it. Defendant agreed to remain on the mortgage until such time as he could be removed "without detriment to either party." Defendant was relieved of any obligation for taxes, mortgage, insurance or other costs associated with the former marital residence. The PSA made clear "[defendant] shall not be responsible for any short fall on the property or appreciation upon completion of the rebuilding if [plaintiff] pursues the reconstruction of the former marital residence sale [sic]."

6

Each party agreed to be solely responsible for any debt acquired in his or her name and each agreed to retain the individual bank accounts in their respective names. They represented they had no "retirement account, savings account, bank account, or investment account, not listed in the Case Information Statement filed with the Court." In that regard, the PSA further provided: "In the event that any asset is discovered in the future, the party whose willful failure to disclose such asset shall forfeit his/her right to such asset and pay the aggrieved party's counsel fees and costs." Each party agreed to retain the interest in any IRA opened in his or her sole name.

The PSA, as previously noted, was fully executed and dated September 25, 2014. Nearly two years later, on August 26, 2016, defendant filed an answer and counterclaim. The counterclaim sought a judgment "[d]etermining the purported Pre-Nuptial Agreement dated June 9, 201[4] . . . unenforceable" as procedurally and substantively unconscionable, and neither fair nor equitable. The parties exchanged discovery, and defendant filed a motion on June 15, 2017, seeking to invalidate the PSA. The court denied the motion. Following entry of the FJOD, defendant filed this appeal.

A-0806-17T3

B.

Defendant's sole challenge on this appeal is to the order that denied his motion to have the PSA invalidated. We thus turn to the parties' certifications in support of, and in opposition to, the motion.

Defendant certified his execution of the PSA was unknowing, uncounseled, and motivated by his desire to reconcile with plaintiff. He claimed he signed an unfair and unconscionable agreement. Underlying his action, and perhaps exacerbating it, was his alcoholism and psychological disorders that were either caused or exacerbated by his alcoholism.

Defendant claimed he did not knowingly enter into the PSA because he did not read it. Moreover, as of the date he signed the PSA, and contrary to its recitals, neither party had provided a Case Information Statement or any other written form of financial disclosures. Defendant acknowledged having general information about plaintiff's employment, an inheritance from her father, and life insurance proceeds she received. He claimed however, he knew no specifics.

Defendant testified during his deposition that he had certain understandings concerning the PSA. For example, he testified, "[m]y understanding was, my wife was going to waive child support, put the kids

A-0806-17T3

through college, and all I had to do was sign the agreement."  When asked if he thought he was required to pay spousal support, defendant replied: "No, she told me I didn't have to."  He understood the PSA incorporated language that he would not be required to pay spousal support.  Further, he understood the agreement required that he pay nothing for the private schools he and his wife had decided the children would attend.  Last, he admitted knowing plaintiff would "get[] the house because it's in the [PSA] and [he] discussed it. . . ."  Concerning the house, he admitted no one attempted to "sneak one in there."

Defendant signed the PSA against the advice of his psychiatrist, who had also been serving as a counselor to both defendant and plaintiff.  Defendant attached to his certification the psychiatrist's notes.  The notes demonstrate that from July through September 2014, both parties expressed considerable ambivalence about divorcing.  For example, in a note referring to plaintiff, the psychiatrist states: "Is very clear that the last thing she wants is for this marriage to end in divorce and that really what she wants as she puts it 'I want the old [defendant] back.'"  Eleven days later, the psychiatrist notes with respect to defendant:  "As usual [defendant] vacillated in his positions, on one hand stating that his life would be easier without [plaintiff] and probably his relationships with the kids would be better and then as was typically his case during the last

9

few minutes of the session start to look very somber [and] and state 'but what I'm saying doesn't matter because [plaintiff] and I will always be together because we are meant to be together.'"

The psychiatrist's notes do, however, confirm he repeatedly counseled defendant against signing the PSA "because [defendant] seems to change his mind almost daily about what he wants from the marriage and because he is still holding to the belief that in the end [plaintiff] and he will be together."

Defendant also signed the agreement against the advice of his attorney. Less than one month after plaintiff filed the divorce complaint, her attorney forwarded a copy of the PSA to defendant's attorney. The day defense counsel received the proposed PSA, a paralegal scanned it, sent it to defendant, and instructed him to review it and schedule an appointment. Rather than follow his attorney's advice, defendant decided to sign the PSA. He wrote to a paralegal in his attorney's office:

> Good morning[.] I have come to a decision to agree to the attached agreement. I am currently at work in Washington, D.C. and then forwarded to Alabama. I would like to have these documents notarized and signed down here and sent to my wife's attorney if that is correct, as soon [as] tomorrow for overnight delivery due to a cease fire of all paperwork being sent out to the signature date. Let me know the best way to handle this and the most amicable.

10

In a written instruction to the paralegal, defendant's counsel handwrote: "I cannot allow him to sign it while I represent him. I have no idea what he is waiving or what she has. Do a Sub of Atty & let him represent himself." Defendant admitted he ignored his attorney's advice and signed the agreement after receiving her email.

Defendant's psychiatrist's notes addressed defendant's signing of the PSA. They state:

> [Defendant] called from DC to say that he had decided to sign the PSA despite being advised repeatedly by me that he should not because he seems to change his mind almost daily about what he wants from the marriage and because he is still holding to the belief that in the end [plaintiff] and he will be together. When asked why he decided to sign it and if he was sober when he made the decision to do so, he stated that he would sign it because "this limbo state is harder than having to deal with the marriage being over." He also assured me that he was totally sober when he made the decision. He also denied drinking the night before.

Although defendant does not claim he was incapacitated due to alcohol when he signed the PSA, he stresses his history of alcoholism and psychological problems. In his certification, he avers that during a period of time before and after he signed the PSA he had been drinking on a regular basis and was being treated by a psychiatrist. He notes he had been institutionalized in December 2013 and January 2014 for psychological problems and excessive drinking.

11

During the time he signed the PSA, he was taking multiple medications. He notes his wife's deposition testimony that she knew he had suffered from depression, bipolar disorder, and had a mental disorder for years.

Defendant also certified that in his opinion the PSA was unfair and unconscionable. It contained multiple factual misstatements, particularly those referring to the exchange of case information statements and financial information. For example, he pointed to a $3000 capital loss on a tax return he and plaintiff filed, and asserted she could not explain it. He also pointed out there was no disclosure about the cash flow or value plaintiff enjoyed from a pre-marital asset, though he acknowledged this premarital asset was not subject to equitable distribution. He nonetheless claimed that the asset's value, as well as the value of her other assets, "would be highly relevant on my future contribution to college."

After defendant signed the PSA, he and plaintiff attempted to reconcile. According to him, they lived and traveled together, and resumed their marriage for approximately eleven months.

Last, defendant emphasized plaintiff's ability to have the bank compromise the debt of their former marital home and he suggested she would reap the benefit of an undisclosed windfall as a result of her efforts.

12

Defendant explained why he signed the PSA: "My impulsivity, a by-product of my psychological issues compounded by my alcoholism, contributed to my signing [the PSA]."

Defendant asserted his waiver of any interest in the marital home was also unfair. He acknowledged that when he signed the agreement, he was aware of three insurance checks totaling $315,224.04 because his attorney had requested a status report concerning the checks. Defendant assigned the checks to plaintiff, hoping at the time to save their marriage. He also signed over to plaintiff his interest in a grant in the amount of $134,967. When he made these assignments, he was aware the house was in foreclosure. He also acknowledged plaintiff was negotiating with the bank to which they owed $375,000. He emphasizes that three days after he signed the PSA, plaintiff was able to negotiate a $65,000 payment to the bank in satisfaction of the $375,000 debt. In addition, during their eleven-month reconciliation, he contributed $60,000 to home improvements. Defendant acknowledged that after the reconciliation failed, he signed a quitclaim deed conveying his interest in the marital home to plaintiff.

Defendant also certified he was unaware of the extent of plaintiff's inheritance from her father, who died in April 2014.

A-0806-17T3

Defendant was working for FEMA when he signed the PSA. He certified he was earning approximately $52,000 per year. According to his certification, the FEMA contract ended on April 4, 2016. As of the date of the certification, he had been unemployed since leaving FEMA. In the interim, he had received revenue by selling off an inventory of vehicles from a failed business plaintiff had helped to finance with a $25,000 gift and $30,000 loan.

Plaintiff's opposing certification rounded out the PSA's backdrop. She began by emphasizing defendant had abided by the PSA's terms since it was signed in 2014.

Responding to defendant's repeated references to his alcoholism and psychological problems, plaintiff did not dispute defendant had a drinking problem, though she noted he had produced no medical records diagnosing him as an alcoholic. She acknowledged defendant struggled with psychological issues but pointed out "he ha[d] been this way throughout most of the marriage, all the while holding a job, working as the [highest ranking person in] a volunteer company, paying the bills and making daily life decisions." To the extent defendant's certification suggested that either his drinking or his psychological issues rendered the PSA unenforceable, she disputed his assertion, noting he had told his psychiatrist he had not been drinking when he

14

signed the PSA. She insisted defendant "knew exactly what he was doing the first time he signed [the PSA] in 2014[,] and the second time he signed it in 2015."

Next, plaintiff averred defendant was not unrepresented by counsel when he signed the PSA. Her attorney sent the PSA to his attorney, who sent it to him. Thus, though defendant may have disregarded his attorney's advice, he was not unrepresented.

Plaintiff explained that it was defendant who initiated discussions about divorce. They had begun marriage counseling in 2011. In May 2012, plaintiff learned defendant had an affair. That October, Super Storm Sandy severely damaged their home and they were forced to move into an apartment. They owed $550,000 on the home. Although defendant had not stopped drinking, "he continued to work and play[ed] a large role in emergency management related to Super Storm Sandy."

In 2013, defendant began to move in and out of the rental unit. On Thanksgiving he attempted suicide. He went to a behavioral health clinic in Florida and she supported his recovery "100 percent, even spending a week in Florida in therapy . . . to understand what co-dependency was and is." During

A-0806-17T3

defendant's recuperation, he received an offer of a good job with FEMA, which he accepted. He returned home in January 2014, but moved out in May.

During the Spring of 2014, defendant told plaintiff he wanted a divorce. Shortly thereafter, they began negotiating the terms of the divorce, though they simultaneously conferred with defendant's psychiatrist. During many sessions, they attempted to negotiate the divorce terms. According to plaintiff, during those sessions she fully disclosed her assets to both defendant and the doctor. Thus, both men were aware of her assets, her anticipated inheritance from her father, the grant money from Super Storm Sandy funds, "the house rebuild," and the insurance checks they had received. Plaintiff insisted defendant "knew everything so for him to say he did not receive full financial disclosures is a lie."

Plaintiff had her attorney draft a PSA in accordance with what she and defendant had discussed, "both privately and with [the psychiatrist]." Plaintiff explained,

> [t]he reason why I waived everything in the PSA was because I wanted to rebuild the house that was damaged in the storm so that the kids could be in the house for Christmas of 2014. I needed the [d]efendant to sign off on the grant money and insurance checks so that I could give the money to the builder. I was willing to waive child support and any financial assistance from him for the kids['] education just so I could get them back in their house for the holidays.

16

A-0806-17T3

Plaintiff deferred signing the PSA because she held out hope the marriage would work. She eventually signed in September 2014. That December, she and the children moved back into the house. Plaintiff averred defendant contributed nothing to rebuild the house. Yet, in May 2015, he returned to the home as they were still attempting reconciliation. Thereafter, he spent some money on a deck and other things he wanted on the house. He spent the money over her objections, because she thought the money should be used to pay for college. She denied defendant spent $60,000 on home improvements. During her deposition, she testified a number of the items defendant said belonged to the house, did not. As an example, she cited one of his purported expenses, a Pep Boys bill for a car canopy, which she had never seen.

The parties went on two vacations, but both times plaintiff had to leave due to defendant's behavior. Defendant had also begun to drink again excessively. In January 2016, he moved out of the rebuilt marital home.

Defendant continued to move in and out periodically. In the Spring of 2016, however, plaintiff found text messages defendant had written about how great his life was in 2011 when he was having an affair. In addition, plaintiff found empty bottles of vodka around the house. She told him to move out, which he did for the last time on June 16, 2016. Plaintiff emphasized defendant signed

17

the PSA twice, once in 2014, and again in 2015. She also emphasized that he had abided by the terms of the PSA since signing it. She noted he had not paid her child support even though the children now are with her "almost 100% of the time." Defendant did not contribute to the tuition for the private schools the children attended. Moreover, when plaintiff refinanced the mortgage on the marital home, defendant deeded his share of the home to her so that his name would be removed from the mortgage.

During plaintiff's deposition, defense counsel asked plaintiff to explain "why this was such a fair deal to [defendant,] who did not get any money from the house." She responded:

> Because if we do regular economics, which would be even if we took 500 and we minused out what we owe, and we split it as two normal people, [defendant] would get $125,000. [Plaintiff] would get [$125,000]. Both of us made equal salaries. So why would we need alimony? [Plaintiff] gave up all child support and the children live with me seven days a week. Even though we have 50/50 custody, they're never with him but out to dinner, that's it. So that's worth something.
>
> Number two is plaintiff pays for all the education. Its 20,000 plus. Mommy pays for everything. So, every bit of clothing, every bit of anything to support a [seventeen]-year-old and [twelve]-year-old, every sport, every summer camp. Children need braces. I have - - I take care of all of it. My daughter is looking to go to college at $65,000 a

18

year at Miami University.  In a regular divorce, what would [defendant] pay?

. . . .

Wait a minute.  I also on top of it loaned [defendant] $55,000.  So, even if you take [$125,000] minus out $55,000 and then have now supported my children for two years, I think it[']s very fair and reasonable.

Plaintiff disputed defendant was entitled to attorney's fees.  She noted she had not violated any order or acted in bad faith.  Moreover, she had gifted defendant $25,000 and loaned him $30,000 to invest in a car dealership he was attempting to start.  According to plaintiff, rather than using the $30,000 for the investment, he used it to pay a lawyer.  He never repaid it.

Defendant filed a reply certification, which consisted mostly of legal argument, but reiterated and reemphasized the facts that he had submitted in his moving certification.

## C.

Based on the parties' certifications and oral argument, the trial court denied defendant's motion.  The court found "[d]efendant's unsupported certification, including uncorroborated claims of mental incapacity and unconscionability . . . [in]sufficient to vacate the PSA."

A-0806-17T3

The court rejected defendant's argument that he was unrepresented when he signed the PSA. The court cited defendant's deposition testimony in which he admitted retaining an attorney after telling plaintiff he wanted a divorce. Thus, the court determined defendant was "the initial party to seek a divorce and retain counsel months prior to the PSA being established."

Next, the court rejected the argument that defendant was drunk when he signed the PSA. The court cited the psychiatrist's notes, proffered by defendant, documenting that defendant assured his psychiatrist not only that he was "totally sober when he made the decision and actually signed the PSA," but offered as proof his working in a Department of Human Services office where he could "never get away with drinking on any level." The court noted defendant also told the psychiatrist he had not been drinking the night before he signed the PSA.

The court rejected defendant's claim that he did not understand the terms of the PSA. In contrast, when deposed, he said his understanding of the PSA was that he would not be required to pay child support. He said: "[m]y understanding was, my wife was going to waive child support, put the kids through college, and all I had to do was sign the agreement." Defendant admitted during the deposition that the provision concerning his non-payment of child support was put in the PSA as a result of "discussions."

20

Defendant also admitted plaintiff told him he did not have to pay alimony. Consequently, the PSA incorporated language memorializing the understanding.

The court concluded that "[a]part from conclusory allegations, [d]efendant has failed to offer any clear or convincing proof to demonstrate he was incapacitated or did not understand the terms of the PSA when he signed."

Next, the court concluded defendant had failed to sustain his burden of demonstrating the PSA was unconscionable, substantively or procedurally. The court found defendant had shown no evidence of unconscionability, overreaching, bargaining disparity between the parties, or patent unfairness. The court rejected defendant's argument concerning the unconscionability of plaintiff's ownership of the marital residence, based on his assertion there was no language in the PSA with regard to debt forgiveness or potential tax consequences. The court found the express language in the PSA refuted his argument.

Last, the court found that by waiting nearly three years before filing the motion to set aside the PSA, defendant had implicitly "ratified" it. The court also exercised its discretion and denied defendant's request for counsel fees.

21

## II.

In a nine-pronged attack on the trial court's decision, defendant argues the court erred by enforcing the PSA. In three of his arguments, defendant contends the trial court failed to make adequate findings of fact and enforced the agreement despite the existence of disputed material facts. In three other arguments, defendant contends the agreement was unenforceable because it was neither fair nor equitable, contained multiple errors, and was unconscionable.

Exacerbating all these errors, according to defendant, was the absence of an attorney's advice given his unique circumstances. Defendant contends the trial court is not entitled to the deference normally given a trial court's factfinding. Last, he contends that apart from considerations of fairness and equity, plaintiff violated a spousal duty to deal fairly when divorcing.

Plaintiff responds that the lower court was clear in its decision and provided adequate findings of fact to support it. Plaintiff asserts the PSA was entered into consensually, and defendant has offered no clear and convincing proof of any facts supporting a legal basis for finding the PSA unenforceable. Last, plaintiff contends defendant ratified the agreement by complying with it for three years, and in any event, the time to vacate the agreement has expired.

A-0806-17T3

Defendant replies that any factual findings made by the court were either inadequate, failed to address material issues, or were made based on arguments defendant never advanced. He insists that precedent requires specific factfinding, not generalized or conclusory findings, particularly on issues of the parties' respective financial circumstances and how a PSA is reached. Defendant disagrees that precedent cited by plaintiff is controlling.

### III.

### A.

We begin our analysis by setting forth basic principles that guide us in our review of a trial court's denial of a motion to set aside a PSA. Our review is limited. "We 'do not disturb the factual findings and legal conclusions of the [motion] judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 587 (App. Div. 2016) (alteration in original) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Conversely, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995) (citation omitted).

A-0806-17T3

Concerning property settlement agreements, we note that "[s]ettlement of litigation ranks high in the pantheon of public policy." N.H. v. H.H., 418 N.J. Super. 262, 279 (App. Div. 2011). This principle "is particularly true in matrimonial matters, where settlement agreements, being 'essentially consensual and voluntary in character[,] . . . [are] entitled to considerable weight with respect to their validity and enforceability' in equity, as long as they are fair and just." Ibid. (alterations in original) (quoting Petersen v. Petersen, 85 N.J. 638, 642 (1981)). "Voluntary agreements that address and reconcile conflicting interests of divorcing parties support our 'strong public policy favoring stability of arrangements' in matrimonial matters." Konzelman v. Konzelman, 158 N.J. 185, 193 (1999) (quoting Smith v. Smith, 72 N.J. 350, 360 (1977)). Thus, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." Id. at 193-94 (quoting Smith, 72 N.J. at 358).

Nonetheless, "'the law grants particular leniency to agreements made in the domestic arena,' thus allowing 'judges greater discretion when interpreting such agreements.'" Pacifico v. Pacifico, 190 N.J. 258, 266 (2007) (quoting Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992)). "The equitable authority of courts to modify property settlement agreements executed

24                                                                    A-0806-17T3

in connection with divorce proceedings is well established." Miller v. Miller, 160 N.J. 408, 418 (1999) (citing Conforti v. Guliadis, 128 N.J. 318, 323 (1992)).

Property settlement agreements "must reflect the strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages." Ibid. (citing Petersen, 85 N.J. at 644). Thus, "[i]f a settlement agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside." Peskin v. Peskin, 271 N.J. Super. 261, 276 (App. Div. 1994). In addition, unconscionability in the negotiations of the settlement may serve as a basis for reforming a property settlement agreement. See Miller, 160 N.J. at 419.

Aside from issues implicating the formation of a property settlement agreement, courts may reform a property settlement agreement if its terms are unfair or inequitable. Id. at 418.

Unconscionable agreements may be reformed or set aside. See Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004). When evaluating an agreement to determine whether it is fair and equitable, or whether it is unconscionable,

> we must consider issues such as the adequacy of the agreement at inception, the presumed understanding of

the parties at that time, the reasonable expectation of the parties during the life of the agreement, the manner in which the parties acted and relied on the agreement as well as the previously stated principle that agreements by their very nature carry with them a stability that must be respected at the time of enforcement or even during periods when modification is at issue.

[Ibid. (citing Konzelman, 158 N.J. at 193).]

Here, defendant does not claim that he was incompetent or lacked the mental capacity to enter into the PSA. To the contrary, he asserts the trial court "inexplicably focused on the 'mental capacity' and competency of the party'" and thus "decided a motion [d]efendant did not file by focusing on 'competency' or 'fraud.'" Nor does defendant argue the contract should be invalidated due to coercion, deception, fraud, or undue pressure. Rather, at the core of defendant's multi-faceted disagreement with the trial court is his claim that the PSA should be set aside due to unconscionability in its formation and its terms. We disagree.

B.

The exception to the general rule of enforcing settlement agreements as the parties intended, due to unconscionability, is narrow. Quinn v. Quinn, 225 N.J. 34, 47 (2016). The facts presented by defendant are not indicative of the facts in cases in which the courts have reformed property settlement agreements based on unconscionability. Miller, 160 N.J. at 418. For example, we reformed

an original property settlement agreement where a wife, unsophisticated in such basic financial matters as preparing a household budget, was represented at her husband's suggestion by his cousin, who represented him both before and after the divorce. Guglielmo, 253 N.J. Super. at 538-39. In consequence, the wife's post-divorce budget was vastly inadequate to support herself and her children, the husband paid a meager amount of child support though he earned four times the amount of his wife's salary, and the children were forced to live in a home that was too small to afford them the privacy of their own bedrooms, which they had enjoyed before the divorce. Id. at 538-39.

In contrast, here defendant had the means to retain his attorney, which he did after informing plaintiff he intended to obtain a divorce. In fact, his attorney represented him through a management conference in which a consent order was entered requiring plaintiff to produce multiple documents that would have provided detailed financial information about the marital household as well as the financial aspects of the restoration of the marital home and her pre-marital assets. Defendant chose to ignore the advice of both his attorney and his doctor when he signed the PSA.

27

Although defendant attempts to attribute his decision to his addiction and illness, the connection between the two, as the trial court found, was largely based on his conclusory statements.

In addition, defendant's deposition testimony demonstrated that he was familiar with the finances concerning the marital home and the money needed to support the children in the manner he and plaintiff had decided upon. For example, he knew the marital home was in foreclosure. He was aware that he and his wife were to receive insurance checks, which she intended to use to attempt to restore the home the children had resided in. He was also aware that if he signed the agreement he would not be required to pay child support or alimony.

Even accepting as true that defendant signed the agreement primarily out of a desire to reconcile with plaintiff, that motivation is insufficient to render the agreement unconscionable. To the contrary, the agreement is not unconscionable.

Defendant repeatedly asserts throughout his argument that the PSA should be evaluated "at the time of enforcement," emphasizing, for example, that he was unemployed at the time of the motion. We must first consider, however, "issues such as the adequacy of the agreement at inception [and] the presumed

understanding of the parties at that time. . . ." <u>Glass</u>, 366 N.J. Super. at 372. When defendant signed the PSA in July, the marital home had been destroyed, the property was in foreclosure, the parties were carrying the added expense of living elsewhere and they were attempting to maintain their children in private schools. The PSA permitted defendant to walk away from the debt associated with the marital home, avoid contributing to the education or even the day-to-day living expenses of his children, and relieved him of the financial obligation of supporting his children in the future.

True, plaintiff's father had died and the parties anticipated she would receive an inheritance. But at the time defendant signed the PSA, the amount of the inheritance as well as what benefit, if any, defendant would derive from it was speculative. Similarly, it is not at all clear from the circumstances extant at the time defendant signed the PSA that he would be entitled to alimony.

Defendant points out that plaintiff knew he was unrepresented by counsel when she signed the PSA in September of 2014. As we have pointed out, however, defendant's lack of representation was due to a choice that he made.

Defendant argues plaintiff violated her duty to act fairly with him during the divorce. The undisputed facts demonstrate that plaintiff shouldered the responsibility of dealing with multiple financial entities after the marital home

was destroyed, bore most of the burden of supporting the children, and was willing to assume the risk of all debt associated with rebuilding the family home. When considered in the context of the totality of circumstances confronting plaintiff and defendant in the aftermath of defendant announcing he wanted a divorce, rather than from defendant's singular perspective, we fail to discern how the PSA defendant signed in July 2014, and plaintiff in September 2014, was unconscionable.

We next consider the reasonable expectations of the parties during the life of the agreement. Glass, 366 N.J. Super. at 372. The parties operated under the agreement for approximately three years before defendant filed a motion to have it set aside. Nothing in the record suggests that during that time defendant made any effort to pay for his children's education or otherwise support them. Although he and plaintiff attempted a reconciliation, nothing in the record suggests defendant contributed toward day-to-day household expenses or the children's needs, such as food and clothing. He claimed to have contributed $60,000 toward the marital home. Perhaps most significantly, after plaintiff was able to arrange to have the marital home rebuilt, defendant complied with the PSA by signing a quitclaim deed and accepting the removal of his responsibility for any debt associated with the home.

A-0806-17T3

In sum, the adequacy of the agreement at its inception, the presumed understanding of the parties at that time, the reasonable expectation of the parties during the life of the agreement, and the manner in which the parties acted and relied on the agreement lead to the conclusion that the agreement was fair and equitable, particularly in view of the principle that "agreements by their very nature carry with them a stability that must be respected at the time of enforcement or even during periods when modification is at issue." Ibid.

IV.

With the exception of the following comments, defendant's remaining arguments are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

We disagree that the trial court failed to make adequate findings of fact. The record belies this assertion. Defendant presses this point, particularly with respect to his argument concerning the adequacy of discovery. In N.H., the appellant argued that "only after deployment of full and broad discovery in search of comprehensive valuations of all the parties' assets can a fair and equitable settlement be achieved." 418 N.J. Super. at 281. We rejected these "unrealistic propositions." Ibid. We do so here as well. Defendant had the opportunity to insist on enforcement of the consent case management order.

A-0806-17T3

Moreover, the record substantiates that he had considerable knowledge about plaintiff's salary, the value and debt of the marital home, insurance proceeds and potential grants concerning the marital home, and the children's educational and other needs to make a knowing decision concerning the PSA.

Defendant also emphasizes there were certain standard clauses under the PSA that were untrue. None of those were material to defendant's decision to execute the PSA. In fact, if his testimony and certifications are believed, he was unaware of the factual inaccuracies. Plaintiff has made no attempt to gain any advantage whatsoever by reason of the inaccuracies in certain standard PSA provisions.

For the foregoing reasons, we affirm the denial of defendant's motion to set aside the PSA.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0806-17T3