NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2522-21

PAUL ROIK,

     Plaintiff-Appellant,

v.

ANITA ROIK,

     Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

January 18, 2024

APPELLATE DIVISION

Argued November 27, 2023 – Decided January 18, 2024

Before Judges Sabatino, Mawla, and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0156-21.

Edward Peter Fradkin argued the cause for appellant (Law Office of Edward Fradkin, LLC, attorneys; Edward Peter Fradkin, of counsel and on the briefs).

Coulter Richardson argued the cause for respondent (Richardson & Richardson, LLC, attorneys; Coulter Richardson, of counsel and on the briefs).

The opinion of the court was delivered by

MAWLA, J.A.D.

As a general proposition, when a spouse dies pending a divorce, the divorce proceeding abates, and with it the statutory right to equitable distribution attendant to a divorce. Carr v. Carr, 120 N.J. 336, 342-43 (1990). The exception to this rule is where "unusual or exceptional" circumstances exist that permit a party to invoke equitable remedies to effect a distribution of marital property notwithstanding the other party's death. Id. at 343, 349-50. Recently, our Legislature amended our intestacy laws and the equitable distribution statute to remedy this issue and close the proverbial "black hole" of Carr.

We hold the amended statutes, namely, N.J.S.A. 3B:5-3(d), N.J.S.A. 3B:8-1, and N.J.S.A. 2A:34-23.1(h)(2) apply retroactively. Independent of the new statutes, we hold where, as here, parties have entered a matrimonial settlement agreement (MSA) and one of the parties has died pending an uncontested divorce hearing, the Family Part may enforce the MSA as long as it is entered at arm's length, and it is fair and equitable to effectuate the parties' mutual intent to divide their assets and liabilities. For these reasons, we reverse and remand the trial court's April 11, 2022 order for further proceedings consistent with this opinion.

I.

Plaintiff Paul Roik and defendant Anita Roik were married for forty-six years when plaintiff filed a complaint for divorce on August 3, 2020. The

complaint attached a certification of insurance coverage indicating there was a life insurance policy, but plaintiff did not own it.

The parties had three children; two sons and a daughter, all of whom were adults and emancipated. During the marriage, plaintiff was employed as an executive until he became disabled and retired; defendant was employed as a librarian and later retired. In 2013, plaintiff executed a will leaving his estate to the children and naming the eldest son executor.

In November 2020, plaintiff filed a Case Information Statement (CIS), which listed a life insurance policy, but stated he did not own it. In January 2021, defendant filed an answer and counterclaim and subsequently filed her CIS in April 2021. Through counsel, the parties negotiated an MSA, which plaintiff and defendant signed on November 24 and November 27, 2021, respectively. Their attorneys signed the document as witnesses to their clients' signatures.

Notably, the MSA contained a provision stating the agreement became effective "upon the date that the last party executes this [a]greement . . . ." There was also a provision that acknowledged the parties' right to a trial and waived the right given the settlement. The parties acknowledged they were "fully and adequately informed of the financial structure of the marriage including their incomes, assets, liabilities and expenses" and waived their right to complete

formal discovery. They also waived their rights of inheritance. The MSA stated the parties read the agreement before signing it and entered it "voluntarily, without threat, force, coercion or duress . . . ." They further acknowledged the agreement was "fair and equitable . . . under all of the circumstances."

The MSA required defendant to pay plaintiff open durational alimony totaling $7,500 per year. The agreement acknowledged neither party could afford to maintain the marital standard of living.

The MSA divided the marital assets equally, save for defendant's pension, which she kept and would use in part to pay alimony. The parties agreed plaintiff would purchase defendant's interest in the former marital residence for $380,000 and assume the expenses associated with the residence. They divided the bank and retirement accounts subject to equitable distribution equally. This meant defendant owed plaintiff approximately $9,409 from the bank accounts and $119,892 from the non-pension retirement assets. Defendant retained her inherited bank and retirement accounts.

The parties agreed the MSA would be incorporated into a judgment of divorce. The MSA also contained the following language: "In any event, whether the [c]ourt allows this [a]greement to be incorporated into said [j]udgment, this [a]greement and all of its terms and provisions shall survive the judgment and shall be valid and enforceable forever." The agreement also noted

it was binding upon the parties' estates, heirs, executors, administrators, assigns and legal representatives.

On November 29, 2021, defendant's counsel emailed the court seeking an uncontested divorce hearing date in January 2022. The court scheduled an uncontested hearing for January 11, 2022. Beginning December 16, 2021, an email discussion ensued between the parties, the eldest son, and the daughter, regarding the uncontested divorce hearing. The daughter urged defendant to opt into a divorce "on the papers" rather than pay two attorneys to attend a virtual uncontested hearing on Zoom. She stated it did not "make sense to wait until [the Zoom hearing date] . . . if you both want things finalized sooner. It's not right that neither of you were given the option to handle it through a faster and cheaper route than . . . [Z]oom." Defendant responded she had no information about the hearing and asked: "Wasn't that arranged two months ago?"

On December 23, 2021, defendant sent plaintiff the following email: "My lawyer says it is more expensive to do paperwork rather than Zoom." That afternoon she emailed the following message: "My lawyer says it would take an hour and a [half] to [two] hours to prepare. Zoom would take only [half an] hour."

On December 25, 2021, plaintiff signed a certification in support of a judgment of divorce on the papers. He died on December 29, 2021.

On January 19, 2022, the eldest son, as executor of plaintiff's estate, moved: to substitute the estate as the real party in interest; enforce the MSA; for a constructive trust; or alternatively to intervene in the divorce litigation; and for other relief not pertinent to this appeal. Defendant opposed the motion and filed a cross-motion for other relief, including to dismiss the divorce.

Defendant certified she knew about plaintiff's will when he executed it in 2013. She knew plaintiff "was in ill health for [a] variety of reasons for a very long time" but denied purposely delaying the divorce until plaintiff died. Instead, she claimed the children were orchestrating the divorce to reap the benefits of plaintiff's estate as his beneficiaries. Enforcing the MSA's provisions would "impoverish her for the remainder of her retirement" and leave her without a residence.

Notably, defendant certified as follows: "The desire to get divorced in a hearing, as opposed to the papers, had nothing to do with delaying the process. The associate I worked with over the summer, and with whom I was very fond, wanted to be able to voir dire me during the uncontested hearing."

Defendant also certified she knew plaintiff "had a life insurance policy with American General – United States Life Insurance Company, on which he was making payments, the death benefit of which was $750,000." She claimed she "recently learned that perhaps as early as 2011" plaintiff transferred

ownership of the policy to the eldest son and changed the beneficiary designation from defendant to someone else. "At some point after that, . . . [defendant] became aware that [the] son . . . bought out or pre-paid the remainder of the payments on that life insurance policy." Defendant's certification attached a March 29, 2011 letter from the insurance carrier enclosing change of beneficiary and change of owner forms. The letter contained a handwritten notation stating: "$40,000 prepaid by son[.] $750,000 policy." Defendant certified the transfer of the policy's owner was "borne out on [plaintiff's] CIS[;] it lists a life insurance policy on his life, with the notation '[p]laintiff does not own [a] life insurance policy.'"

The eldest son's reply certification noted defendant conceded she knew plaintiff no longer owned the life insurance policy because it was disclosed on the CIS. The policy was disclosed and "was never outside the realm of discovery [because plaintiff] provided a statement to [d]efendant's attorney through his attorney during the divorce." The son took over the policy at plaintiff's request because plaintiff could no longer afford the premiums.

Following oral argument, the trial court issued a detailed written opinion denying the motion and granting the cross-motion. After surveying the extant case law, the judge concluded there were no

> unusual or exceptional circumstances to abatement of
> the divorce proceeding . . . present[ed] in this matter

[because defendant] did not intentionally cause [plaintiff's] death. There was no adjudication of facts during the lifetime of the parties[,] justifying entry of the final judgment of divorce. There was no court ordered disposition of any property prior to [plaintiff's] death. Nor was there any pendente lite agreement to sell or divide marital assets.

The judge concluded he could not enforce the MSA because there was no way of discerning, by voir dire, the parties' mutual intent, and whether they knowingly and voluntarily entered their agreement. The judge cited Administrative Office of the Courts Directive #18-20, which promulgated the form "Certification in Support of Judgment of Divorce" required for a divorce on the papers. However, he found "[e]ven if the parties proceeded with a divorce on the papers, which they didn't, such a procedure does not relieve the court of its obligations to find the parties knowingly and voluntarily entered the MSA." The judge concluded he could not grant the motion because

> while the MSA reflects electronic signatures of the parties witnessed by their respective attorneys, at no time prior to [plaintiff's] death did the court make findings as required pursuant to Rule 1:7-4 to establish that the parties knowingly and voluntarily entered the MSA without coercion or duress, a precondition to enforcement of the MSA. . . . Further, the MSA was never made part of a [f]inal [j]udgment of [d]ivorce, either through an [u]ncontested [d]issolution [h]earing or divorce on the papers, and hence, the MSA is not enforceable as a court order.

The estate was not entitled to a constructive trust because there was no evidence of wrongdoing by defendant showing she would be unjustly enriched. She owned the marital residence with plaintiff as tenants by the entirety and would receive the residence by operation of law. And the estate's claim defendant delayed the divorce proceedings lacked merit.

II.

On appeal, the estate argues the judge erred because the existence of a signed MSA demonstrated unusual and exceptional circumstances warranting substitution of the estate as the real party in interest in the divorce proceeding. The court should have enforced the MSA to avoid a windfall to defendant. Also, the parties and their attorneys indicated their desire to proceed to an uncontested hearing, and multiple provisions of the MSA prove the parties contemplated the agreement was final and irrevocable, even in the event of death. The estate urges us to remand to a different judge.

Following the initial briefing and before oral argument, A. 2351/S. 2991 (2022) were introduced proposing to amend our intestacy and equitable distribution statutes to close the black hole by permitting the court to make an equitable distribution where a party died pending a divorce proceeding. We requested counsel address the relevancy of the proposed legislation at oral argument and whether the legislation could be retroactively applied by courts if

it became law.  Following oral argument, the legislation passed the Assembly and Senate by unanimous vote, and we directed counsel to file supplemental briefs on the retroactivity issue.  Governor Murphy signed the new legislation into law on January 8, 2024, which we will discuss in greater detail below.

III.

Although we typically defer to a trial judge's factfinding when "supported by adequate, substantial, credible evidence," Cesare v. Cesare, 154 N.J. 394, 411-12 (1998), we do "not accord the same deference to a . . . judge's legal determinations."  Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017).  "[T]he trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review.  . . . Our review of a trial court's legal conclusions is always de novo."  Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013) (internal citation omitted).

IV.

We, like the trial judge, have canvassed our case law and are unable to find circumstances like those presented here.  Indeed, in Olen v. Olen, the trial court tried a divorce matter to conclusion but entered a judgment of divorce only memorializing the court's decision on the cause of action.  124 N.J. Super. 373, 374-75 (App. Div. 1973).  Subsequently, one of the parties died, and the surviving spouse argued an amended judgment of divorce bearing the trial

court's rulings regarding the parties' assets could not be entered. Id. at 376. We held the amended judgment could be entered, nunc pro tunc, as of the date of the trial court's ruling because it had adjudicated the facts during the parties' lifetimes. Id. at 377. In Witt v. Witt, a court enforced the parties' pendente lite agreement to sell the marital home where one party subsequently went missing. 165 N.J. Super. 463, 464-66 (Ch. Div. 1979).

Olen and Witt are clearly inapposite. The former case involved an adjudication of facts whereby only the ministerial act of entering the judgment memorializing the disposition of the issues remained. The latter case did not involve the death of a spouse and turned more so on the court's equitable authority to preserve the marital estate pendente lite, a power of the Family Part, without question, possesses. Randazzo v. Randazzo, 184 N.J. 101, 113 (2005).

Carr stands for the proposition that the court can exercise its equitable powers where a party dies during a divorce and can neither receive equitable distribution because the divorce has abated nor a spousal elective share from the deceased spouse's estate because a divorce was initiated. 120 N.J. at 345-46. There, following a protracted pendente lite litigation and discovery, the supporting spouse failed to appear for trial and was subsequently hospitalized. Id. at 340. During his hospitalization, he disinherited the supported spouse, leaving his entire estate to his children and subsequently died. Id. at 340-41.

Our Supreme Court held the trial court correctly found the supported spouse was not entitled to equitable distribution because there were no "circumstances that ma[d]e [the] surviving spouse's claim unusual or exceptional" to overcome "the general rule[ that] equitable distribution is conditioned on the termination of marriage by divorce." Id. at 343. The statutory spousal elective share was likewise unavailable to the supported spouse, pursuant to N.J.S.A. 3B:8-1, because of the divorce filing and the parties' separation. Id. at 344. However, the Court concluded, notwithstanding the lack of statutory right to the marital assets, the equitable remedy of a constructive trust may be invoked to prevent an unjust enrichment or fraud. Id. at 351.

In Kay, we applied the holding in Carr and overturned the trial court's denial of a constructive trust on behalf of the deceased spouse's estate. 405 N.J. Super. 278, 280-81 (App. Div. 2009). There, the surviving spouse, and her daughter (not decedent's daughter) charged expenses to the decedent's credit card prior to his death, titled family assets in her name and the daughter's name, and following decedent's death attempted to withdraw escrowed funds from the sale of the former marital residence. Id. at 281-82. We concluded the fact the estate sought the constructive trust rather than the surviving spouse, did not bar the estate's ability to assert equitable claims against the marital estate because "[t]he equities that warrant an equitable remedy arise from 'facts which call for

relief from the strict legal effects of given situations.'" Id. at 284 (quoting Carr, 120 at 351). "A blanket prohibition against equitable claims pressed by the estate would have the inherent potential to disserve public policy by encouraging spouses contemplating divorce to deal unfairly with one another." Id. at 285. In Kay, the public policy issue was the prevention of the dissipation of marital assets by the surviving spouse; a statutory consideration in equitable distribution, pursuant to N.J.S.A. 2A:34-23.1(i). Ibid.

Like the trial judge here, we discern no basis to invoke the equitable remedy of a constructive trust because the facts do not support a finding defendant engaged in untoward conduct of the sort in Carr and Kay. That, however, does not end the inquiry. Indeed, the duty of spouses to deal fairly with one another is a general obligation not limited to instances where an unjust enrichment is alleged. Fattore v. Fattore, 458 N.J. Super. 75, 88 (App. Div. 2019).

There are other public policy considerations at play here because the parties had a signed MSA. "An agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute." Quinn v. Quinn, 225 N.J. 34, 45 (2016) (citing Sachau v. Sachau, 206 N.J. 1, 5 (2011)). Public policy favors the enforcement of such agreements "as the parties intended." Id. at 47. However, the court must find the parties knowingly and

voluntarily entered into the provisions of the agreement for it to be enforceable. Id. at 39. "Family Part judges possess a broad supervisory role in determining the fairness of agreements between spouses." Fattore, 458 N.J. Super. at 87.

With these principles in mind, we turn to the facts and evidence presented to the trial judge. At the outset, we note although the judge cited extensively from Directive #18-20, including the fact that it "change[d the] procedure [for an uncontested divorce,] such that only the filing party must complete and submit the [c]ertification when requesting a dissolution judgment without a personal appearance" he overlooked the fact that plaintiff had filed such a certification in support of judgment. The certification contained sufficient information for the judge to evaluate whether plaintiff had entered the MSA voluntarily. Although there was no evidentiary objection asserted to the court's ability to consider the certification, if there was, it would be admissible under N.J.R.E. 804(b)(6) (the hearsay exception for trustworthy statements by deceased declarants).

Even without the certification, the MSA expressed the parties' mutual intent and belief the MSA was fair and equitable, and they wished to be bound by it. The record is devoid of evidence to the contrary or any evidence defendant considered the agreement to be unfair. Defendant's reasons for wanting a Zoom divorce proceeding were based on her understanding it would be more cost

14

effective than filing documents for a divorce on the papers. Her decision was also borne seemingly of a desire to give the associate representing her some courtroom experience. In other words, defendant did not plan on objecting to either the entry of a judgment or the MSA.

Furthermore, defendant knew about the life insurance policy, and nonetheless settled the case. And the MSA's equitable distribution provisions were otherwise unremarkable and worked to defendant's advantage as she no longer had an alimony obligation once plaintiff died. Her assertion she would be without the home was also unpersuasive because she agreed plaintiff could buy out her interest.

The overwhelming evidence showed a final judgment would have been entered, but for the scheduling delay of the divorce hearing. The equities, therefore, did not support discarding the MSA and dismissing the matter.

For these reasons, we reverse and remand the matter to the trial judge and direct him to grant the estate's request to substitute as the real party in interest and enter a judgment incorporating the MSA. In doing so, we do not undermine the potential value of the solemnity of an uncontested divorce proceeding when it is desired by the parties, or Directive #18-20's requirements for a divorce on the papers. Our ruling is based on the discrete circumstances of this fact pattern.

V.

At oral argument and in its supplemental brief, the estate argued we must apply the newly passed statutes retroactively. Defendant's submissions assert the new law took effect on the day the Governor signed it and is prospective and therefore inapplicable here. We examine the text of the new statutes.

The Legislature created N.J.S.A. 3B:5-3(d), which states:

> "Surviving spouse, partner in a civil union, or domestic partner" shall not include: an individual who has filed a complaint not dismissed pursuant to [Rule] 4:6-2 . . . or against whom a complaint not dismissed pursuant to [Rule] 4:6-2 . . . has been filed for: divorce, dissolution of civil union, termination of domestic partnership, or divorce from bed and board.
>
> [(Emphasis added).]

The Legislature amended N.J.S.A. 3B:8-1 governing the spousal elective share to read as follows:

> If a married person, partner in a civil union, or person in a domestic partnership dies domiciled in this State the surviving spouse, partner in a civil union, or domestic partner has a right of election to take an elective share of one-third of the augmented estate under the limitations and conditions hereinafter stated, unless either the decedent or the surviving spouse, partner in a civil union, or domestic partner had filed a complaint not dismissed pursuant to [Rule] 4:6-2 . . . for divorce, dissolution of civil union, termination of domestic partnership or divorce from bed and board.
>
> [(Emphasis added).]

A-2522-21

And the Legislature amended the equitable distribution statute to read as follows:

> If a complaint not dismissed pursuant to [Rule] 4:6-2 . . . has been filed for [divorce, dissolution of civil union, or divorce from bed and board] and either party to the litigation dies prior to the entry of the final judgment, the court's authority to effectuate an equitable distribution of the property shall not abate.
>
> [N.J.S.A. 2A:34-23(h)(2) (emphasis added).]

Furthermore, the Legislature created N.J.S.A. 2A:34-23(h)(3), which reads as follows: "The court may not make an award concerning the equitable distribution of property on behalf of a party barred from inheriting under [N.J.S.A. 3B:8-1]." As we noted, the Legislature made the new laws effective immediately.

The legislative statement accompanying the new law, in part, states:

> This bill provides that if a complaint has been filed for divorce, dissolution of a civil union, or divorce from bed and board, and either party to the litigation dies prior to the entry of the final judgment, the court has authority to effectuate an equitable distribution of the property. In addition, the bill expands the laws of intestate succession and elective share to include partners in a civil union and also provides that a surviving spouse, partner in a civil union, or domestic partner who has filed a complaint or against a complaint has been filed for divorce, dissolution of civil union, termination of domestic partnership, or divorce from bed and board, would not receive an intestate share of the decedent's estate and has no right of election to take an elective share of the estate. This bill is intended to

eliminate what has been known as the "black hole" that exists when a surviving spouse is excluded from receiving his/her share of equitable distribution when a spouse dies prior to a final judgment of divorce being issued and the surviving spouse is therefore left without a remedy.

[Sponsors' Statement to A. 2351 (February 7, 2022).]

As a general proposition "the law favors prospective, rather than retroactive, application of new legislation unless a recognized exception applies." Ardan v. Bd. of Rev., 444 N.J. Super. 576, 587 (App. Div. 2016). "Courts must apply a two-part test to determine whether a statute should be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and [if so] (2) whether retroactive application 'will result in either an unconstitutional interference with vested rights or a manifest injustice.'" Id. at 587 (quoting James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014)). The presumption against retroactivity "can be overcome by an indication of contrary legislative intent, either expressed in the language of the statute itself, or implied in its purpose." State v. Bey, 112 N.J. 45, 103 (1988). If we determine that retroactive legislative intent exists, we must "apply the statute in effect at the time of [our] decision . . . to effectuate the current policy declared by the legislative body." Ibid. (quoting Kruvant v. Mayor & Council of Twp. of Cedar Grove, 82 N.J. 435, 440 (1980)).

The exceptions to the general rule of prospective application are where: (1) when the Legislature intended retroactive application of the statute either expressly, as "stated in the language of the statute or in the pertinent legislative history," or implicitly, required retroactive application to "make the statute workable or to give it the most sensible interpretation"; (2) when the statute is "ameliorative or curative"; or (3) when the "expectations of the parties may warrant retroactive application . . . ." Gibbons v. Gibbons, 86 N.J. 515, 522-23 (1981). "Under the second exception to the general rule, the term 'ameliorative' refers only to criminal laws that effect a reduction in a criminal penalty." Street v. Universal Mar., 300 N.J. Super. 578, 582 (App. Div. 1997) (quoting Kendall v. Snedeker, 219 N.J. Super. 283, 286 (App. Div. 1987)).

There is also pipeline retroactivity whereby a new rule of law applies retroactively to a certain type of case. "In the civil context, pipeline retroactivity of a new rule of law contemplates that three classes of litigants will be beneficiaries: those in all future cases, those in matters that are still pending, and the particular successful litigant in the decided case." N.H. v. H.H., 418 N.J. Super. 262, 285 (App. Div. 2011).

The degree of retroactivity "depends largely on the court's view of what is just and consonant with public policy in the particular situation presented." Primmer v. Harrison, 472 N.J. Super. 173, 189 (App. Div. 2022) (quoting

Beltran v. DeLima, 379 N.J. Super. 169, 174 (App. Div. 2005)).   Relevant considerations include "(1) 'justifiable reliance by the parties and the community as a whole on prior decisions,' (2) whether the purpose of the new rule will be advanced by retroactive application, and (3) any adverse effect retrospectivity may have on the administration of justice."  Ibid.

Pursuant to these principles and our reading of the plain language of the new laws and the legislative statement, we conclude the new statutory provisions should apply retroactively to pending cases that were not dismissed prior to the effective date of the new statutes.  The revised statutes and the statement ostensibly create pipeline retroactivity because the new law applies to pending complaints, which have not been dismissed under Rule 4:6-2(e) for failure to state a claim.  As we highlighted above, the revised statutes speak in the past tense and apply to cases where a party "had" filed a complaint or where a complaint "has been" or "had been" filed.

The revised statutes are clearly curative, which also supports their retroactive application to cases in the pipeline.  The legislative statement expressly says the new laws were designed to close the Carr black hole.  Applying the new laws to cases in the pipeline advances the purpose of the law and does not frustrate the administration, but instead provide trial courts grappling with this issue a means to resolve cases in accordance with the law.

## VI.

Finally, we decline to assign the matter to a different judge. The trial judge made no credibility findings and, although we have concluded he misapprehended the court's equitable powers, his opinion reflects a conscientious effort to apply the law to the facts presented. In short, we are unconvinced the judge was so committed to his findings to warrant his disqualification on remand. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 617-18 (1986).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2522-21

21